**George SCHARMER,**
**Plaintiff-Appellant,**

**v.**

**CARROLLTON MANUFACTURING**
**COMPANY et al.,**
**Defendants-Appellees.**

No. 74–2148.

United States Court of Appeals,
Sixth Circuit.

Argued June 17, 1975.

Decided Oct. 28, 1975.

Albert L. Ely, Jr., Ely & Golrick, Cleveland, Ohio, George H. Mortimer, New York City, for plaintiff-appellant.

Alan P. Buchmann, Squire, Sanders & Dempsey, Cleveland, Ohio, William T.

Allmon, Carrollton, Ohio, Bernard J. Cantor, Jerold I. Schneider, Cullen, Settle, Sloman & Cantor, Detroit, Mich., for defendants-appellees.

Before PHILLIPS, Chief Judge, and WEICK and EDWARDS, Circuit Judges.

WEICK, Circuit Judge.

Appellant Scharmer has appealed from a judgment of the District Court dismissing his five count substitute complaint following the granting of three successive motions of the defendants for summary judgment.

In his complaint, filed in 1970, Scharmer asserted claims for infringement of two patents owned by him and three claims for unjust enrichment, unfair competition, and violation of the antitrust laws.

In three Memorandum Opinions and Orders the District Court held that U.S. Patent No. 2,884,649 relating to stainless sheet metal work surfaces was not infringed; that U.S.Patent No. 3,235,886 relating to kitchen sinks and methods of manufacture was invalid because of sales made of the patented article more than one year prior to the filing date of the application for the patent. With respect to Scharmer's claims for unjust enrichment, unfair competition, and antitrust violation, the Court held that he had no standing to assert claims, the right of action to which was vested in his bankrupt corporation, New Milford Construction and Repair Company; that a 1973 assignment purportedly executed after bankruptcy by an officer of the bankrupt company, to Scharmer, was not effective to transfer to him any asset or chose in action which belonged to the bankrupt company; and that plaintiff's claim for violation of a trade secret is without merit because of public disclosure thereof in his patent and sales of the article prior to the patent. We will take up these claims in the order in which they were treated by the District Judge.

## I

## UNFAIR COMPETITION, UNJUST ENRICHMENT, TRADE SECRET AND ANTITRUST VIOLATIONS, COUNTS III, IV AND V OF COMPLAINT

Scharmer was an officer, director and owner of all of the issued and outstanding capital stock of New Milford Construction and Repair Company (a New Jersey corporation), except qualifying shares. New Milford was engaged in the manufacture, sale and installation of stainless steel sink bowls, sink tops, scullery sinks, and self rimming sinks. Carrollton Manufacturing Company was also engaged in the manufacture and sale of kitchen sinks.

The District Court found that in 1959 New Milford and Carrollton had engaged in discussions which contemplated that New Milford would purchase stainless steel sink bowls from Carrollton, to be used in the making of completed sinks, and Carrollton would buy back the completed sinks from New Milford.

During the negotiations Scharmer claimed that he disclosed to a representative of Carrollton a method which he conceived for joining the stainless steel bowl to the drainboard, which method he asserted was a trade secret.

As a result of the negotiations very few orders were given: in 1960 only 181 bowls were purchased by New Milford, processed into sinks and sold back to Carrollton. The total amount of business transacted between the companies in 1960 amounted to only $5,000, and there were no additional sales between them since that time.

On July 5, 1962 New Milford was adjudicated bankrupt on its voluntary petition. Scharmer was one of its creditors and he received a dividend of 3%, which was the amount paid on the claims of all general creditors. The schedules filed in the bankruptcy proceeding did not list any claims of the bankrupt against Carrollton, and no such claims were administered in the bankruptcy proceeding.

Although New Milford had paid no franchise taxes to the state of New Jersey since 1963, Scharmer contended that its corporate existence continued under New Jersey law for the purpose of winding up its affairs.

On January 23, 1973, during the pendency of the present suit, a resolution was adopted by the directors of New Milford, which resolution purported to recite that at the time when New Milford's business was discontinued by bankruptcy it was understood and agreed by the directors "that George A. Scharmer would succeed to any and all right, title and interest in and to property, choses in action, and other things of value owned by New Milford . . . " and undertook to authorize Evelyn Scharmer, vice-president of New Milford, to execute an assignment and transfer to Scharmer, which she did on the same day.

Also during the pendency of the present suit Carrollton defaulted on secured obligations which it owed to Union Commerce Bank and Cummings Bank. The banks foreclosed on their security which consisted of real and personal property, and they later sold the foreclosed assets to a subsidiary of Brass-Craft Manufacturing Company for use in its manufacturing operations. Defendant Yanowitz represented the subsidiary in the acquisition. As a result Carrollton has ceased doing business, but it apparently has continued its existence as a corporate entity.

Scharmer made the banks, the subsidiary, and Yanowitz parties defendant to his suit.

## THE ASSIGNMENT

The alleged assignment, under which Scharmer claimed title to sue for New Milford's damages, was executed during the course of the company's bankruptcy proceedings and was to take effect following entry of the final order in bankruptcy.

Under the provisions of 11 U.S.C. § 110(a)(5) the trustee of the estate of the bankrupt was vested with title to all of the bankrupt's property, including rights and choses in action. See *Gochenour v. Cleveland Terminals Bldg. Co.,* 118 F.2d 89 (6th Cir. 1941).

■ The trustee in bankruptcy, with the approval of the bankruptcy court, may elect to abandon assets of the bankrupt. Following abandonment title revests in the bankrupt. *In re Thomas,* 204 F.2d 788 (7th Cir. 1953); *Rosenblum v. Dingfelder,* 111 F.2d 406 (2d Cir. 1940). However, this doctrine has no application to unscheduled assets of which the trustee was ignorant and had no opportunity to make an election. *First Nat'l Bank of Jacksboro v. Lasater,* 196 U.S. 115, 118, 25 S.Ct. 206, 49 L.Ed. 408 (1905).

■ Nor does this doctrine apply when the bankruptcy court has never authorized the abandonment of such assets.

When new assets are discovered following the close of a bankruptcy case the proper procedure is to apply to the bankruptcy court to reopen the case pursuant to Bankruptcy Rule 515, for administration of the assets.[1] I *Collier on Bankruptcy,* ¶ 2.49 (1974). See *Tuffy v. Nichols,* 120 F.2d 906 (2d Cir.), *cert. denied,* 314 U.S. 660, 62 S.Ct. 113, 86 L.Ed. 528 (1941); *In re Mirsky,* 124 F.2d 1017 (2d Cir.), *cert. denied,* 317 U.S. 638, 63 S.Ct. 29, 87 L.Ed. 514 (1942); *In re Dacus,* 34 F.Supp. 841 (E.D.Tenn.1940). This procedure should have been employed by Scharmer if he desired to acquire title to the unscheduled assets of his bankrupt corporation. I *Collier on Bankruptcy,* ¶ 2.50 (1974). The bankruptcy court could then have exercised its discretion as to whether to reopen or decline to reopen the case. *In re Perl-*

1. Bankruptcy Rule 515 provides:

   A case may be reopened on application by the bankrupt or other person to administer assets, to accord relief to the bankrupt, or for other good cause. The application shall be filed with the clerk of the district court having custody of the papers in the case. The case shall be referred forthwith for action on the application and for further proceedings therein.

*man,* 116 F.2d 49 (2d Cir. 1940). If the case is reopened the bankruptcy court would then have an opportunity to appraise the unscheduled assets and decide whether they should be administered or abandoned. But this procedure was not followed.

■ Instead, Scharmer chose a more circuitous route. The result was that New Milford was never revested with title to the rights of action alleged in Scharmer's complaint, and the alleged assignment to Scharmer was a nullity. See *Constant v. Kulukundis,* 125 F.Supp. 305 (S.D.N.Y.1954); *Grauman v. City Co. of New York,* 113 F.Supp. 437 (S.D.N.Y. 1941). Scharmer does not have standing to sue in his own behalf for any claim for damages owned by New Milford. *Former Stockholders of Barr Rubber Prods. Co. v. McNeil Corp.,* 325 F.Supp. 917 (N.D.Ohio 1970), *aff'd,* 441 F.2d 1169 (6th Cir. 1971).

## II

### A. TRADE SECRET

■ The property right in a trade secret ceases to exist after the secret has become public property through general disclosure. If a trade secret is patented there is no further right to secrecy. The patent is a legal disclosure with the right to a limited, temporary monopoly granted as the reward for disclosure. *Sandlin v. Johnson,* 141 F.2d 660 (8th Cir. 1944); *Newport Industries, Inc. v. Crosby Naval Stores, Inc.,* 139 F.2d 611, 612 (5th Cir. 1944). See *Grant v. Raymond,* 31 U.S. 218, 242, 6 Pet. 218, 8 L.Ed. 376 (1832).

■ Scharmer's application for a patent, dated June 24, 1963, was not a disclosure of, nor a dedication of, his secret to the public. This is evidenced by the practice of the United States Patent Office of maintaining all applications in secrecy pending disposition. *A. O. Smith Corp. v. Petroleum Iron Works Co.,* 73 F.2d 531, 537 (6th Cir. 1934); 37 C.F.R. § 1.14, 35 U.S.C.A. App. I, at 653.

■ When the patent was granted on February 22, 1966, Scharmer's property right in the trade secret ceased prospectively. Thus, he had no right of action for misuse of a trade secret subsequent to that date. *Sandlin v. Johnson, supra.*

■ The fact that the patent was subsequently declared invalid negates only the inventor's right to a limited monopoly and not the public disclosure which attends issuance of the patent.

■ But there was public disclosure of the alleged trade secret prior to the issuance of the patent. It occurred when Scharmer's company, New Milford, in 1960 resold the units back to Carrollton. The alleged trade secret became plainly visible merely by looking at the units. This was shown by uncontroverted evidence. It was no longer a secret.

Furthermore, the units upon resale became the property of Carrollton, and Carrollton acquired good title to them and had full right to mortgage or sell the same.

The District Court held that Patent No. 3,235,886, plus the fact that the alleged trade secret could be visually observed, "seriously undermined" any viable claim of a trade secret. We agree.

The District Court further stated:

Finally, at his deposition, the plaintiff testified that he has no idea whether the matter which he allegedly disclosed to the Carrollton employee approximately thirteen years ago was ever disclosed by that person to his employer or to any other third persons.

### B. UNFAIR COMPETITION AND UNJUST ENRICHMENT

■ In his deposition Scharmer testified that neither the banks, nor Brass-Craft, nor Yanowitz, had ever contracted with or unfairly competed with New Milford, nor had they injured New Milford by actions in violation of the anti-trust laws. However, Scharmer did contend that they had acquired and were holding assets which should be awarded to him in the event that he should prevail against Carrollton. Scharmer was attempting to impose a constructive

trust on property formerly owned by Carrollton and mortgaged to the banks, and which property had been sold after foreclosure sale to a purchaser.

The District Judge rejected this contention. We agree. Scharmer has not prevailed on any claim which he has asserted against Carrollton. He is not in position to subject assets formerly owned by Carrollton to the payment of his unliquidated claim.

Throughout his complaint Scharmer claimed damages "for injuring plaintiff in its business of manufacturing stainless steel sink tops . . . ." Yet Scharmer testified in his deposition that he was not in the business of manufacturing sinks other than through New Milford, and that his injury was derivative of New Milford's.

### III

### ANTITRUST VIOLATION

■ It is not understandable how Scharmer can assert in his own right the claim of New Milford against others for antitrust violation. *Former Stockholders of Barr Rubber Prods. Co. v. McNeil Corp.*, 325 F.Supp. 917 (N.D.Ohio 1970), *aff'd*, 441 F.2d 1169 (6th Cir. 1971).

Under Ohio law shareholders have no individual right of action for damage to the corporation. 13 Ohio Jur.2d, *Corporations*, § 868.

In our opinion, on the basis of the uncontroverted facts, the District Court was correct in granting summary judgment.

We affirm the summary judgment granted on Counts III, IV and V of the complaint.

### IV

### COUNT II, PATENT No. 3,235,886

■ In Count II Scharmer alleged infringement of Claims 1–4 of Patent No. 3,235,886, applied for on June 24, 1964 and issued on February 22, 1966, on a kitchen sink and method of making same. Claim 1, which is typical, reads:[2]

1. A sink-drainboard unit comprising a stainless sheet metal deep drawn sink having a bowl and a rim on at least one side of the bowl, said rim being part of the flat sheet from which the bowl is deep drawn and in the original plane of said sheet, and a flat drainboard of stainless metal sheet butt welded solely along a straight line in the plane of the rim and the drainboard to the said rim.

The District Court granted summary judgment, concluding that the patent claims were invalid because of prior public use and sale of the invention more than one year prior to the date of patent application.

35 U.S.C. § 102(b) prohibits the granting of a patent where:

(b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

See *Smith & Griggs Mfg. Co. v. Sprague*, 123 U.S. 249, 258, 8 S.Ct. 122, 31 L.Ed. 141 (1887); *Consolidated Fruit-Jar Co. v. Wright*, 94 U.S. 92, 24 L.Ed. 68 (1876).

■ A public use or a sale which invalidates a patent must be a use or sale of the very invention patented. *Goodwin v. Borg-Warner Corp.*, 157 F.2d 267 (6th Cir.), *cert. denied*, 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683, *reh. denied*, 329 U.S. 835, 67 S.Ct. 631, 91 L.Ed. 707 (1946), *motion for leave to file second petn. for reh. granted*, 331 U.S. 796, 67 S.Ct. 1726, 91 L.Ed. 1823, *second petn. for reh. denied*, 331 U.S. 869, 67 S.Ct. 1749, 91 L.Ed. 1872 (1947). *Accord, Chicopee Mfg. Corp. v. Columbus Fiber Mills Co.*, 165 F.Supp. 307, 323 (M.D.Ga. 1958).

The crucial inquiry therefore is whether the sinks sold by New Milford in 1960 were the very invention subsequently

---

2. The difference in the claims is that they describe single and double sink units with drainboards on one or opposite sides of the rim.

patented. During Scharmer's deposition the following colloquy transpired:

Q . . . I am trying to get to the approximate date when you switched over, from the technique of cutting a hole in the middle of a drainboard and dropping the sink bowl into it, to the technique of welding the drainboard to the side-edge flange, side edge of the flange of the single [sink?] bowl.

A I thought I had it, I would say, about the middle of the year, which would be about June.

Q Of 1960?

A Of 1960, yes, because this letter was dated October 27, 1970 [sic 1960]. And Mr. Seabrook [of Carrollton] says in here that he wanted to thank me for the hospitality we had offered Bob and him, and it was most gratifying to see the operation. And this is around October 27th, as close as I can determine without going through my diary and trying to visualize, step by step, what has happened. That is the closest date I can give you.

Q So we can assume, then, it is an approximate date?

A It is an approximate date.

Q But there was no question that it was sometime during the middle of 1960, give or take a month?

A Yes, I think so.

Q And the sinks that were made that way were shipped to Carrollton?

A Yes, after that period of time (A. 166–167)

When this testimony regarding products manufactured and sold in 1960 is evaluated against the claims of the patent in suit, it is apparent that the sink drainboard units sold by New Milford in 1960 were made in accordance with Patent No. 3,235,886, the application for which was not made until June 24, 1964.

Scharmer testified that the units which were made for Carrollton had an additional piece (pieces) butt-welded to the edge so that they would be wide enough to form the edge border which had to be bent following the welding operations.

In an effort to avoid the consequences of 35 U.S.C. § 102(b) Scharmer contends that because of the addition of this extra piece the units manufactured for Carrollton are different from that which he claimed in his patent.

■ The claims of a patent, and not the specifications, measure the invention. *Milcor Steel Co. v. George A. Fuller Co.,* 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942); *Kaiser Industries Corp. v. McLouth Steel Corp.,* 400 F.2d 36, 39 (6th Cir. 1968), *cert. denied,* 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969).

■ Therefore, if every element of Claim 1 is found in the product sold in 1960, the patent is invalid. *Minnesota Mining & Mfg. Co. v. Kent Industries, Inc.,* 409 F.2d 99 (6th Cir. 1969).

The patent claimed as its invention a stainless steel metal sink and drainboard unit where the drainboard is butt-welded to the side rim of the bowl. Scharmer testified that after additional pieces (or an additional piece) were added to the bowl in an effort to widen the rims, the above-described (claimed) process was performed.

We conclude that the 1960 sink drainboard units incorporated every one of the elements of the patent claim. The welded piece (pieces) merely served to widen the sink rims. Following this operation there was a sink with an elongated edge to which the drainboard was butt-welded, as described in Claim 1.

The fact that the actual product sold may have incorporated an unclaimed feature would not prevent § 102(b) from invalidating the patent. See *Minnesota Mining & Mfg. Co. v. Kent Industries, supra,* at 101.

The District Court was correct in holding this patent to be invalid.

V

COUNT I, PATENT No. 2,884,649

■ The two banks were alleged to have infringed the patent by selling

sinks which they had acquired from Carrollton by foreclosure of their liens thereon. Brass-Craft was also alleged to have purchased some of the sinks. Yanowitz was alleged to have received assets from Carrollton including some profits which Carrollton received from sales of sinks, which allegedly infringed Scharmer's patent. The defense was that the patent is invalid and was not infringed.

The District Court, on motion for summary judgment, considered the deposition of Scharmer, affidavits filed by the parties, the patent in suit, and prior art patents, and held that on the basis of the uncontroverted evidence Scharmer's patent had not been infringed. The Court did not pass upon the validity of the patent.

The specifications of the patent describe the nature of the invention:

The present invention relates to stainless sheet metal work surfaces adapted to be set into an opening in the top of a kitchen cabinet and to be removably clamped to the top. More particularly the work surface preferably is part of a kitchen appliance, or provides access to a kitchen appliance, such as the drainboard for a sink, a stove, a container for deep fat frying or for scraps, a knife sharpener, a blender-mixer, and the like. (A. 106)

The two novelties claimed for the patent are a bent hemmed edge on the metal, and a reinforcing sheet to reinforce the light gauge metal. The patent specifications describe them as follows:

1—Bent Hemmed Edge:

As seen more clearly in Figs. 2 and 10, each margin is bent down and back upon itself to form the rounded edge and supporting flange 13 and then down to form an attaching web or leg 15. (A. 106)

2—Reinforcing Sheet:

The work surface or appliance top of the invention is made of stainless sheet metal such as Monel, chromium-nickel steel and the like. The thickness of the sheet metal may vary considerably but usually will be within the range of 14 to 24 gauge. Material of 20 to 24 gauge is preferred for reasons of cost and ease of working but it has sufficient strength to resist bending stresses to which it is subjected in use or is too weak to stand the work which is to be carried out upon it. With such light gauge metal the sheet is reinforced in any desired way, preferably by a backing sheet, e. g., of plywood, composition board, asbestos board, heavier gauge mild or plain carbon steel, or the like to give it the necessary strength. The backing sheet also serves as sound deadening material. With metal sheets of heavier gauge, such as 14 to 18, a reinforcing sheet may not be necessary. . . . (A. 106)

Scharmer alleges that the defendants infringed claims 1–5, 7 and 12 of his patent.

Claim 5 refers to the bent hemmed edge, and reads as follows:

5. A sheet metal work surface adapted to be set into an opening in the top of a kitchen cabinet comprising a sheet of stainless metal having a plane surface of substantial extent, at least one edge of said sheet being bent down and back upon itself to form a double thickness supporting marginal flange and then down to form an attaching web. (A. 108)

Claim 2, which Scharmer admits was typical, with respect to the bent edge and reinforcing sheet, reads:

2. A combined appliance top and work surface comprising a sheet of stainless metal of such light gauge as to have insufficient strength to resist bending stresses in use, each margin of said sheet being bent down and back upon itself to form a rounded edge and supporting flange and then down to form an attaching web, a sheet of reinforcing material substantially coextensive with said sheet inside said web, said sheets having registering openings to provide access to a kitchen

appliance, and means for holding the reinforcing sheet in supporting relation against the under side of said stainless metal sheet. (A. 108)

Affidavits submitted by the defendants in support of their motion for summary judgment were to the effect that neither Brass-Craft nor Carrollton ever manufactured or sold sinks having an edge bent down and back upon itself to form a double thickness supporting flange. Furthermore, since they employed heavy gauge metal in their sinks, reinforcing sheets were unnecessary, and were not used.

The affidavits further set forth that Carrollton, from 1956 to 1969, used masonite strips as padding between the sink rims and clamping screws to prevent dimpling or scarring of the metal surface. After 1969 Carrollton replaced the masonite strips with plastic button pads, which were positioned over the clamping screws for the same purpose. Brass-Craft (Georgetown) employed similar plastic button pads. By no stretch of the imagination can it be claimed that these button pads were used to reinforce thin gauge metal.

In his affidavit in opposition to the defendant's motion Scharmer acknowledged that Carrollton and Brass-Craft sinks were constructed by welding an angle strip to the sink flange, which was a well-recognized method of making a double thickness supporting flange. The welding was disclosed in Hornik's prior art Patent 2,968,815.

Scharmer took the position that his patent claims were broad enough to cover a sink with a *welded* double thickness edge, and that the patent does not require actual bending to create the bent edge, but rather that the bent edge is merely a definition of shape. In addition Scharmer argued that even if the claims call for a bent edge, Carrollton's sink is the full equivalent from the standpoint of structure and process. Scharmer further argued that the masonite strips and plastic buttons served as reinforcement, and he described the

buttons as interrupted, rather than continuous, reinforcement.

The District Court, after analyzing the claims and specifications of the patent, concluded that under the doctrine of equivalents the bent hemmed edge did not cover a sink without such an edge, and that the masonite padding strips or plastic buttons were not the equivalent of the patent's reinforcing sheet. The masonite padding strips and the plastic buttons were never used by Carrollton or Brass-Craft for the purpose of reinforcing the metal. The Court thereupon granted the defendant's motion.

Noninfringement may be decided upon a motion for summary judgment when no genuine issue of material fact exists and when the Court, without the aid of expert opinion, can determine that the accused device does not contain all the elements set forth in the claims. *Graphicana Corp. v. Baia Corp.,* 472 F.2d 1202 (6th Cir. 1973); *Smith v. General Foundry Mach. Co.,* 174 F.2d 147 (4th Cir.), *cert. denied,* 388 U.S. 869, 70 S.Ct. 144, 94 L.Ed. 533 (1949).

The law is settled that every element of a claim charged to be infringed must be found in the infringing device, and an omission of any element precludes infringement. *FMC Corp. v. F. E. Myers & Bro. Co.,* 384 F.2d 4, 10 (6th Cir. 1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *Graphicana Corp. v. Baia Corp., supra;* *Brown v. Ford Motor Co.,* 57 F.Supp. 825, 827 (E.D.Mich.1944).

The law is also clear that a limitation in a claim may not be disregarded by a court in determining infringement. *Shearer v. Atlas Radio Co.,* 94 F.2d 304, 306 (6th Cir. 1938). See *Lektophone Corp. v. Rola Co.,* 282 U.S. 168, 51 S.Ct. 93, 75 L.Ed. 274 (1930).

Therefore we may not disregard the clear language of the claimed limitation describing one edge as "being bent down and back upon itself" which appears in claims 1, 2, 5, and 12. *Shearer v. Atlas Radio Co., supra.*

The embodiments of the invention, *i. e.* a single sheet bent back upon itself to form a rounded edge, are clearly distinguishable from an embodiment comprised of separate sheets welded together.

The method of angle welding is disclosed by the earlier Hornik Patent No. 2,968,815. Carrollton did not infringe when it used the prior art method of welding. This issue also was relevant to the validity of the patent.

Scharmer contended that his claimed invention, *i. e.* the bent hemmed edge, is broad enough to cover an edge which has a double thickness as a result of welding an angle strip to the sink flange. This is the method used by the manufacturing defendants to make the attaching web. As before stated, this angle welding was taught in the prior art patent of Hornik. Thus, invalidity through anticipation was again raised.

The District Court found that the masonite strips and button pads did not provide the type of reinforcement contemplated by "reinforcing sheets" as defined in Scharmer's patent claim. In our opinion the District Court was correct.

The masonite and button pads would provide protection only from dimpling or scarring at the point of contact of the clamping screw, whereas the reinforcing sheet would serve to spread the stress as transmitted from any given point. The purposes served by the masonite and the button pads are distinguishable from the function performed by the "reinforcing sheets". Therefore there is not identity of a way of performing a function so as to satisfy the test of equivalency. Deller's *Walker on Patents,* 7 § 548.

In light of this clear distinction between the invention claimed by Scharmer and the sinks actually manufactured by Carrollton and Brass-Craft, we conclude that the District Court was correct in holding that claims 1, 2, 5, and 12 were not infringed.

Finally, the defendants have argued that the reinforcing sheet was publicly used by Scharmer prior to his patent application. This clearly raises a question of invalidity under 35 U.S.C. § 102(b).

The District Court as part of its conclusion acknowledged prior public use of the reinforcing sheet by Carrollton in 1956. The Court also concluded that the prior public use obviated any possible liability for *infringement,* which is correct. However, the Court did not make relevant findings of fact or conclusions that Carrollton's prior public use invalidated Scharmer's patent claims.

The District Court did not have the benefit of our recent decision in *Hieger v. Ford Motor Co.,* 516 F.2d 1324 (6th Cir. 1975), which required the issue of validity to be adjudicated, as an invalid patent is a blight on the public interest in promoting competition of ideas in the public domain. Had this decision been available to the District Court, the Court would have passed upon the validity of the patent.

Under the circumstances of this case we have decided that it is not necessary to remand for further findings on the issue of validity. This leaves the validity of the patent undetermined.

Affirmed.