[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 21-12985

_____

SUBSCRIBER HOLDINGS, LLC,

                                             Plaintiff-Appellant,

*versus*

BRIGHTSTAR CORP.,

BRIGHTSTAR DEVICE PROTECTION, LLC,

f.k.a. Esecuritel Holdings LLC,

BRIGHTSTAR RE LTD,

f.k.a.Esecuritel Re Ltd.,

BRIGHTSTAR US, INC.,

MOBILE LEASING SOLUTIONS, LLC,

                                             Defendants-Appellees,

BRIGHTSTAR LOGISTICS PTY LIMITED, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-01991-TWT

_____

Before JORDAN, ROSENBAUM, Circuit Judges, and STEELE, District Judge.[*]

PER CURIAM:

Subscriber Holdings sued Brightstar Corporation, asserting claims under the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1). It also sued Brightstar Device Protection (a subsidiary of Brightstar Corporation) for breach of a non-disclosure agreement. The district court granted summary judgment in favor of the Brightstar defendants, and Subscriber Holdings now appeals. With the

_____

[*] The Honorable John Steele, U.S. District Judge for the Middle District of Florida, sitting by designation.

benefit of oral argument and following a review of the record, we vacate and remand.[1]

## I

The district court concluded that Subscriber Holdings' "Subscriber Assistance Program" (the SAP) for mobile phone companies was not a protectable trade secret for two reasons. First, the SAP was not defined with sufficient concreteness so as to be ascertainable by proper means. *See* D.E. 155 at 9–10 (citing *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 22 F. Supp. 3d 1305, 1314 (N.D. Ga. 2014)). Second, the SAP had been publicly disclosed (1) in a 2012 phone call by Sean Woodward, Subscriber Holdings' sole owner and employee, to Clayton Bodnarek, an employee of Brightstar, prior to execution of the non-disclosure agreement; and (2) in a 2010 patent application. *See id.* at 10–14.

We review the district court's grant of summary judgment de novo. *See Edmondson v. Velvet Lifestyles, Inc.*, 43 F.4th 1153, 1159 (11th Cir. 2022). We view the facts in the light most favorable to the non-moving party, and even where the underlying facts are undisputed, summary judgment is inappropriate if reasonable persons could differ on the inferences to be drawn from those facts.

---

[1] As we write for the parties, we assume their familiarity with the record and set out only what is necessary to explain our decision. We generally refer to the defendants collectively as Brightstar.

*See Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296–97 (11th Cir. 1983).

## A

To address Subscriber Holdings' challenge to the summary judgment order, we first examine the parameters of the SAP. In the district court, Subscriber Holdings agreed that the SAP (and hence its trade secret) was contained in documents entitled the First Program Guide and the Second Program Guide. *See* D.E. 144 at 11.

The First Program Guide summarized the SAP as follows:

**Subscriber Assurance**

Subscriber Assurance covers subscriber attrition (or default) due to involuntary separation from employment, divorce, disability, military deployment, or death.

- Indemnifies the wireless Carrier (beneficiary)
- Purchased by the Subscriber (policyholder)

**Benefit**

- Enables carriers to more effectively manage attrition risk
- Ensures carrier/manufacturer reimbursement for devices and early termination fee
- Reduces upfront subscription cost(s): deposit alternative and lower device cost

- Expedites migration to smart phones by subscribers; drives data consumption revenues
- Allows existing Subscribers one (1) out of cycle upgrade

**Cost Components**

- Nonrefundable enrollment fee paid at inception of agreement
- Monthly recurring premium charge
- Deductible due at time of claim

D.E. 130-4 at 3. The "Product Matrix" on the next page included—alongside a Premium and Deductible—a Device Upgrade, described as "Limit one (1) upgrade per enrolled subscriber per two (2) consecutive years of coverage." *Id.* at 4.

The Second Program Guide described the SAP as a "subscriber default (or attrition) protection product. When Subscriber default occurs, Subscriber Assurance pays the wireless carrier full reimbursement for subsidized device costs provided to the Subscriber at the inception or beginning of the wireless contract and all early termination fees required within the terms and conditions of the wireless contract." D.E. 130-7 at 3. The page with that description contained a photo of a mobile phone next to the words "Unforeseen occurrences sometimes happen. Reassure your wireless stakeholders with Subscriber Assurance." *Id.* (emphasis omitted).

In a later page entitled "Why Buy? – Device Upgrade," the Second Program Guide provided the following question and answer:

> Why would a Subscriber who wants to upgrade his/her wireless device purchase Subscriber Assurance™?
>
> A Subscriber who wishes to upgrade his/her wireless device prior to the end of the initial contract term purchases Subscriber Assurance because the product enables the Subscriber to upgrade his/her device prematurely or out-of-cycle; prior to the end of the standard two (2) year wireless contract.

*Id.* at 8. Another two pages in the Second Program Guide explained when a device upgrade was "available" and "not available." *See id.* at 9-10. And in a page entitled "Subscriber Impact," the Second Program Guide again stated that "one out-of-cycle upgrade" was permitted in a two-year period. *See id.* at 11.

The Second Program Guide listed examples of how the SAP might work. It described Option 1 (High Cost) as a migration from a cell phone to an iPhone 4 for $549 with a month-to-month program; Option 2 (Mid Cost) as a migration from a cell phone to an iPhone 4 for $199 with a two-year contract; and Option 3 (Low Cost) as a migration from a cell phone to an iPhone 4 for $49 with SAP enrollment for $75 and a two-year contract which "allows out-of-cycle upgrades in conjunction with extension of contract term." *Id.* at 12.

A Pricing Guide accompanied the First and Second Program Guides. The Pricing Guide was a document created by Mr. Woodward using a spreadsheet (created for another entity) containing routine actuarial information. He conducted online research and found information regarding the correlation between phone subscriber FICO scores and defaults on wireless contracts at an industry level. *See* D.E. 133-1 at 186–92. By inserting this data into the spreadsheet, he created a method of pricing a subscriber default insurance program. *See id.* at 184–87.

## B

The Georgia Trade Secrets Act and the federal Defend Trade Secrets Act define a trade secret similarly. In Georgia, a trade secret is "information . . . including . . . a program . . . which is not commonly known by or available to the public" and which "(A) [d]erives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and is "(B) the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4). Under federal law, a trade secret means "all forms and types of . . . information, including . . . programs" if "(A) the owner . . . has taken reasonable measures to keep such information secret" and "(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use

of the information." 18 U.S.C. § 1839(3). The parties address the state and federal claims together, and we will do the same.

1

We first conclude that the district court erred in ruling that, as a matter of law, the SAP was not described concretely enough to constitute a trade secret. Whether information constitutes a trade secret is generally an issue of fact under both Georgia law and federal law. *See Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686 n.2 (11th Cir. 1998) (Georgia law); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (federal law). Viewing the evidence and inferences in the light most favorable to Subscriber Holdings, a jury could reasonably find that (1) the SAP included as components a one-time/out-of-cycle phone upgrade during the two-year term of the contract and a corresponding pricing model and that (2) the entire SAP was a protectable trade secret.

The district court incorrectly characterized the phone upgrade component of the SAP as merely a "benefit," and the Brightstar defendants are likewise mistaken in claiming—at the summary judgment stage—that there are only "passing references" to the phone upgrade component in the SAP and that the documents which set out the SAP "cannot reasonably be argued to disclose an early upgrade program[.]" Br. for Appellees at 33. The phone upgrade component is listed on the matrixes for the First Program Guide and the Second Program Guide, and it takes up

three pages of the Second Program Guide.  A jury could reasonably find that the early upgrade component was part of the trade secret.

The district court also wrongly determined that trade secret protection was unavailable because the Pricing Guide applied commonly-known and commonly-used actuarial formulas to publicly available information.  *See* D.E. 155 at 12.  As we have explained, "[e]ven if all of the information is publicly available, a unique compilation of that information, which adds value to the information, . . . may qualify as a trade secret." *Finnegan*, 160 F.3d at 686.  We find significant the evidence in the summary judgment record that the phone upgrade component of the SAP was non-existent in the industry at the time Subscriber Holdings had its discussions with Brightstar.  *See* D.E. 133-1 at 144.  The inclusion of that component into the risk management aspect of the program may therefore have created a trade secret.  *See* D.E. 132-4 at 21; D.E. 133-1 at 34–35.[2]

2

We also conclude that the district court erred in ruling, at summary judgment, that Subscriber Holdings publicly disclosed the SAP prior to the execution of the non-disclosure agreement through (1) Mr. Woodward's 2012 discussions with Mr. Bodnarek

---

[2] In so holding, we do not mean to accept Subscriber Holdings' characterization of the SAP as a phone upgrade program with a subordinate risk management feature.  *See* Br. for Appellant at 20.  We hold only that a reasonable jury could find in favor of Subscriber Holdings on the trade secret issue.

and (2) the filing of a 2010 patent application for "Loss Mitigation Analysis." We explain why below.

With respect to the 2012 discussions, Mr. Bodnarek's email setting out the components of the SAP did not mention the phone upgrade component. *See* D.E. 132-3 at 4–5. And at his deposition, Mr. Bodnarek could not remember Mr. Woodward mentioning the phone upgrade component of the SAP. *See* D.E. 133-2 at 127. A jury could therefore reasonably find that Mr. Woodward did not disclose that component of the SAP, and a limited disclosure does not necessarily mean that trade secret protection is lost. *Cf. Penalty Kicks Mgmt. Ltd. v. Coca-Cola Co.*, 318 F.3d 1284, 1292–93 (11th Cir. 2003) ("The unauthorized use need not extend to every aspect or feature of the trade secret[.]").

Turning to the 2010 patent application, the general rule is that the issuance of a patent destroys trade secret protection. *See* Annotation, *Disclosure of Trade Secret as Abandonment of Secrecy*, 92 A.L.R.3d 138, § 3(c) (1979 & 2022 Supp.). *See also Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) ("That which is disclosed in a patent cannot be a trade secret."); *Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 99 (6th Cir. 1975) (explaining that, once a "trade secret is patented there is no further right to secrecy"); *Newport Ind. v. Crosby Naval* Stores, 139 F.2d 611, 613 (5th Cir. 1944) ("A trade secret . . . cannot possibly be patented."). But here, the relevant aspects of the patent application did not mention, much less describe, the phone upgrade component. *See* D.E. 130-14 at 43 ¶ [003]. *See also id.* at 44–45 ¶ [0048].

If a component of a multi-faceted program is not disclosed, it is difficult to see how the purported trade secret—comprised of all of its component parts—is in the public domain as a matter of law. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 875 (5th Cir. 2013) ("[A] patent destroys the secrecy necessary to maintain a trade secret only when the patent and the trade secret both cover the same subject matter.") (citation and internal quotation marks omitted); *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 518 (S.D.N.Y. 2017) ("[A] plaintiff can still have a viable trade secrets claim if elements of the trade secret go beyond what was disclosed in the patent application.") (citation and internal quotation marks omitted); *Giasson Aerospace Science, Inc. v. RCO Eng'g, Inc.*, 680 F. Supp. 2d 830, 841 (E.D. Mich. 2010) (explaining that patents which "do not . . . disclose the salient features of the asserted trade secrets" do not constitute public disclosure as a matter of law). As a result, "[w]hether [Subscriber Holdings] had a [protectable] trade secret and whether it was something beyond what was disclosed in the . . . patent were matters for the jury to decide." *Atl. Research Mktg. Sys.*, 659 F.3d at 1357 (internal quotation marks omitted).

## C

We likewise conclude that the district court erred in finding that Subscriber Holdings failed to allege a breach of the non-disclosure agreement. Although Subscriber Holdings argued that Brightstar Device breached the non-disclosure agreement by using or disclosing the early upgrade component of the SAP without authorization, *see* D.E. 30 ¶ 78 & D.E. 143 at 13, the district court

limited the confidential information at issue to the risk management feature of the SAP. *See* D.E. 155 at 14. It then concluded, based on its finding that Subscriber Holdings had previously disclosed this "concept" of the SAP, that there could be no breach. *See id.* That is because, the district court reasoned, the non-disclosure agreement "imposes no obligation where the confidential information is or becomes a matter of public knowledge through no fault of Brightstar Device[.]" *Id.* (internal quotation marks omitted).

We believe that this ruling as to the viability of Subscriber Holdings' breach claim was misguided because the district court defined the trade secret too narrowly. A finding that Subscriber Holdings disclosed the *risk management* aspect of the SAP prior to the execution of the non-disclosure agreement does not resolve whether Brightstar Device breached the non-disclosure agreement by improperly using or disclosing the *phone upgrade* component of the SAP. *See Celeritas Techs., Ltd. v. Rockwell Intern. Corp.*, 150 F.3d 1354, 1358 (Fed. Cir. 1998) (affirming a jury's verdict for breach of a non-disclosure agreement where the defendant disclosed "implementation details and techniques that went beyond the information [the plaintiff had previously] disclosed in [a] patent"). As we have explained above, a jury could reasonably determine that Subscriber Holdings did not disclose that component of the SAP before entering into the non-disclosure agreement.

The proper inquiry is whether a jury could reasonably find that Brightstar Device breached the non-disclosure agreement by

unauthorizedly using or disclosing the phone upgrade component of the SAP. We hold that it could.

The non-disclosure agreement restricted the use of confidential information exchanged between the parties for the purpose of their business relationship and to certain persons within the parties' organizations "having a need to know such information in order to evaluate the business relationship." D.E. 130-3 ¶¶ 2–3. We conclude that the record contains evidence from which a jury could reasonably find that Brightstar Device used or disclosed the phone upgrade component of the SAP beyond the purpose of the parties' business relationship.

Specifically, the record includes evidence (1) that the phone upgrade component of the SAP did not yet exist in the industry at the time the parties entered into the non-disclosure agreement; (2) that the phone upgrade component of the SAP was contained in the Program Guides disclosed to Brightstar Device via the non-disclosure agreement; (3) that Subscriber Holdings did not disclose the phone upgrade component of the SAP to any other party, before or after entering into the non-disclosure agreement; (4) that Brightstar manages trade-in and buy-back programs as a central part of its business; (5) that early upgrade programs drive trade-in and buy-back programs; (6) that Marcelo Claure, Brightstar's former CEO, revealed that it took between 9 and 11 months to "implement a buyback and trade-in program;" (7) that approximately nine months after Brightstar received the Program Guides, Apple began an iPhone trade-in program with Brightstar; (8) that one

month after that, TMobile launched its JUMP! Program with the Apple iPhone 5, making it the first early upgrade program in the market; (9) that Brightstar has handled iPhone trade-ins for Apple across carriers since the launch of the first early upgrade program; (10) that Brightstar was considered to be at the center of the "big shift" away from device subsidies, which was driven by early upgrade programs; (11) that Brightstar financially benefited from this shift; and (12) that in 2014, a former Brightstar employee, Mr. Bodnarek, was considered "a subject matter expert on early upgrade programs." *See* D.E. 130-4 at 2–3; D.E. 133-1 at 34–35, 94–95, 143–45, 281–84, 290–95, 299–303.

Based on the summary judgment record, and viewing the evidence in the light most favorable to Subscriber Holdings, a jury could reasonably find that the concept of an early upgrade program only became known to others and was implemented in the market as a result of Brightstar Device using or disclosing the concept beyond the limitations prescribed by the nondisclosure agreement. Summary judgment was inappropriate.

## II

Subscriber Holdings also challenges the district court's denial of both its motions to compel. In its motions, Subscriber Holdings argued that Brightstar's discovery was deficient, asserting in part that Brightstar had only produced 77 documents and was improperly withholding documents based on its unilateral definition of the alleged trade secret. *See* D.E. 81-1 at 3, 6, 23; D.E. 81-2 at 3;

D.E. 113-1 at 3. The district court disagreed and denied the motions, finding that Brightstar had "substantially responded" to the interrogatories and production requests that were "relevant." D.E. 139. It further ruled that Subscriber Holdings' additional discovery requests were "not proportional to the needs of the case considering the importance of the discovery in resolving the issues" and thus, "the burden of the discovery outweigh[ed] its likely benefit." *Id.* The district court later granted Brightstar's summary judgment motion, which was already pending at the time it denied the motions to compel. *See* D.E. 155.

On appeal, Subscriber Holdings contends that the district court committed reversible error because it did not allow for proper discovery before granting Brightstar's motion for summary judgment. For the most part, we agree.

We review the district court's management of discovery for abuse of discretion. *See Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021). "A district court abuses its discretion when it applies an incorrect legal standard, employs improper procedures, makes findings of fact that are clearly erroneous, or commits a clear error of judgment." *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1360 (11th Cir. 2021) (citation and internal quotation marks omitted).

"Before entering summary judgment the district court must ensure that the parties have an adequate opportunity for discovery." *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990) (citing *Celotex Corp. v. Catrett,* 477 U.S.

317, 322 (1986)). A district court properly denies a motion to compel or other requests for additional discovery "[w]here a significant amount of discovery has been obtained, and it appears that further discovery would not be helpful in resolving the issues." *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991). But if the requested discovery "would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials." *Snook v. Tr. Co. of Georgia Bank of Savannah*, 859 F.2d 865, 870 (11th Cir. 1988).

After a review of the record and based on our conclusions in Part I of this opinion, we believe that at least some of the disputed discovery requests were relevant to the scope of the alleged misappropriation and to whether Brightstar Device breached the non-disclosure agreement. Our belief is instructed by several factors.

First, some of the disputed discovery requests relate to Brightstar's involvement with early upgrade programs. *See generally* D.E. 81-2 at 10–11, 19–25. Brightstar objected to these requests on the ground that they were overly broad and sought information that extended beyond the scope of the alleged trade secret, which it maintained was limited to a subscriber default insurance program. *See* D.E. 85-1 at 11–14. Yet this narrow characterization of the trade secret ignores the early upgrade component of the SAP. As set out in Part I, a jury could reasonably find that this aspect of the SAP is part of a protectable trade secret. Related discovery requests may therefore fall within the scope of permissible discovery.

*See DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 681 (N.D. Ga. 2007) (holding that the scope of discovery is properly determined by the identified trade secret).

Second, Brightstar admitted to withholding responsive discovery regarding requests for information as to its buy-back and trade-in programs, device protection programs, and device sales and lease business. *See, e.g.,* D.E. 81-2 at 32–34, 44–55, 60–64, 69–81. *See also* D.E. 85-1 at 69–105. Brightstar argued that the requests encompassed virtually all aspects of its business and bore no relationship to whether it improperly used or disclosed the trade secret. *See* D.E. 119 at 17. *See also* D.E. 85-1 at 17–18. [3]

Subscriber Holdings responded in part that Brightstar disclosed the alleged trade secret, inclusive of the early upgrade program, to wireless carriers which later implemented early upgrade programs of their own, driving trade-in and buy-back programs and resulting in a direct financial benefit on Brightstar's core business. *See* D.E. 112 at 6. The summary judgment record, viewed in Subscriber Holdings' favor, supports the existence of an interrelationship between the implementation of early upgrade programs

---

[3] Brightstar also objected to the disputed requests on the basis that some of the requests extend beyond the proper time period or are unduly burdensome. *See* D.E. 119 at 18–24. We do not opine on whether the time period covered by the disputed requests is appropriate or whether the requests create an undue burden on Brightstar. The district court should consider these issues on remand, in light of our holdings above.

and Brightstar's business, further evidencing the relevancy of the related requests.  *See* D.E. 133-1 at 291, 300.

Third, the timing of the district court's entry of its scheduling order also gives us pause.  The district court entered a scheduling order on January 6, 2021, setting a retroactive cut-off for discovery on November 30, 2020, and denied the motions to compel the same day.  *See* D.E. 137 at 2; D.E. 139.  Though the parties had proposed November 30 as a discovery cut-off date months earlier, the district court never acted on that proposed scheduling order. Subscriber Holdings therefore never had the chance to refine its requests based on the district court's rulings on the motions to compel.  We think the district court here abused its discretion in entering a retroactive scheduling order because the order deprived the parties of discovery opportunities they otherwise would have had.

We conclude, therefore, that at the time the district court denied Subscriber Holdings' motions to compel, Brightstar had not "substantially responded" to the discovery requests that were "relevant." Nor was it the case that Subscriber Holdings had already obtained "a significant amount of discovery" from Brightstar so as to render the district court's denial of the motions proper.  *See Avirgan*, 932 F.2d at 1580.  At the crux of the issues on summary judgment was the scope of the alleged trade secret, and Brightstar improperly limited the scope of its discovery obligations by narrowly defining the trade secret.  Thus, because it "appears that further discovery [c]ould [have] be[en] helpful in resolving the issues"

presented by Brightstar's summary judgment motion, we conclude that the district court abused its discretion in denying Subscriber Holdings' motions to compel in toto. *See id.*

In view of our holdings today, the district court should revisit the discovery issues on remand and reopen discovery for a limited period to allow for appropriate discovery to proceed as necessary.

## III

We vacate the district court's grant of summary judgment in favor of the Brightstar defendants and denial of Subscriber Holdings' motions to compel, and remand for further proceedings consistent with our opinion.

**VACATED AND REMANDED.**