691 F.2d 885
 1982-83 Trade Cases 65,015
 Fred STEIN, an individual; Miriam Stein, an individual; Fred
Stein, as assignee of Century Cinema Circuit, a
California corporation, Plaintiffs-Appellants,
v.
UNITED ARTISTS CORPORATION, a Delaware corporation; Pacific
Theaters Corporation, a California corporation, Laemmle
Theaters, Inc., a California corporation; Phoenix Theaters,
Inc., a California corporation; Westwood Theaters, a
co-partnership; Twentieth Century-Fox Film Corporation, a
New York corporation; United Artists Theater Circuit, a
California corporation; Paramount Pictures Corporation, a
wholly owned subsidiary of Gulf & Western corporation, a
Delaware corporation; Peter Myers, an individual; Norman
Levy, an individual; Columbia Pictures Industries, Inc., a
New York corporation; Bernard Myerson, an individual,
Defendants-Appellees.
 No. 80-5337.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 9, 1981.
Decided Nov. 3, 1982.
 
 Frederick A. Lorig, Kendrick, Netter & Bennett, Los Angeles, Cal., for plaintiffs-appellants.
 Peter Smoot, Robert Holtzman, Loeb & Loeb, Los Angeles, Cal., argued for defendants-appellees; Robert A. Meyer, Loeb & Loeb, Los Angeles, Cal., Judianne Jaffe, Swerdlow, Glikbarg & Shimer, Beverly Hills, Cal., Rintala, Smoot & Jaenicke, Andrew M. White, Wyman, Bautzer, Rothman, Kuchel & Silbert, Roy L. Shults, Mitchell, Silberberg & Knupp, Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before KENNEDY and REINHARDT, Circuit Judges, and CRAIG,* District Judge.
 KENNEDY, Circuit Judge:
 
 
 1
 Appellant Fred Stein was the primary shareholder and officer of Century Cinema Circuit, Inc. ("Century"), an operator of motion picture theaters in Southern California. The complaint charges various motion picture exhibitors, distributors, and individual officers with conspiring to violate the antitrust laws by discriminating against Century in the licensing of first-run films. Stein, joined by his wife in certain of his claims, sues both as assignee of Century's antitrust claims and in his individual capacity. He alleges that appellees conspired to force him to sell them half of Century's stock at less than fair market value by boycotting the company. In 1976, following the alleged activity, Century filed for and was granted a rearrangement under Chapter XI of the Bankruptcy Act. Century did not list the antitrust claim among its assets in that proceeding.
 
 
 2
 The main issues on appeal are whether Century, despite its failure to list the claim, can now enforce its antitrust action through its assignee, Stein, and whether Stein has standing on his own to challenge appellees' behavior under the antitrust laws. The district court resolved these questions against appellants, and granted appellees' motions to dismiss all counts. We find that Century cannot enforce its antitrust action without first having sought to reopen the bankruptcy proceedings or to obtain an order of abandonment from the bankruptcy court, because the claim did not revest in Century at the completion of the Chapter XI proceedings. We further hold that Stein cannot challenge appellees' anticompetitive activity as creditor or shareholder, even if the boycott of Century was intended to drive down share prices. We affirm dismissal of this action.
 
 
 3
 Stein had been an exhibitor of motion pictures since the early 1950s. In 1973, he formed Century, retaining two-thirds of its stock and transferring the remainder to his son, Robert. From November 1, 1973, to December 31, 1976, Century was engaged in operating theaters throughout Southern California and Arizona. On October 11, 1976, Century petitioned for the rearrangement of its affairs under Chapter XI of the Bankruptcy Act[1]. At the end of December 1976, Century closed or disposed of all of its motion picture theaters. A plan of arrangement with Century's creditors was confirmed in late June 1977, calling for the liquidation of Century's remaining assets and the distribution of the cash proceeds to the creditors. The plan was completed by June 15, 1978, and the estate was closed.
 
 
 4
 The Steins filed this antitrust action in June 1979. Stein sought to proceed both individually and as assignee of Century, and his wife, Miriam, sought to proceed individually and as assignee of Robert and Carol Stein, the remaining shareholders of Century. Appellants alleged that all of the Steins had lent substantial sums to Century. They sought to recover damages as creditors and guarantors of a major portion of its indebtedness.
 
 
 5
 The appellees are five corporate motion picture exhibitors, four corporate motion picture distributors, two individuals employed by two of the distributors, and one individual alleged to have been an executive of a former owner of Century's theaters.
 
 
 6
 The complaint in general depicted a conspiracy to drive Century out of business because of its refusal to participate in an existing conspiratorial scheme for the allocation of first-run motion picture licenses among major exhibitors and distributors. Count I of the first amended complaint charged appellees with violating sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and sections 3 and 4 of the Clayton Act, 15 U.S.C. §§ 14, 15 (1976) in these respects: refusing to license first-run motion pictures to Century's theaters; denying its theaters the opportunity to bid, negotiate for, or obtain first-run motion pictures; giving Century's competitors preferential treatment in bidding or negotiating for first-run motion pictures; and refusing to evaluate Century's offers on their merits and in a nondiscriminatory manner. The second count challenged the same conduct under California's antitrust laws, Cal.Bus. & Prof.Code § 16600 et seq. The third count was based on state law unfair competition, and the fourth claimed intentional interference with contractual rights and prospective advantage.
 
 
 7
 On March 3, 1980, the district court granted appellees' motion to dismiss all counts for failure to state a claim upon which relief could be granted. The court held that Century's failure to list the antitrust claim in the Chapter XI proceedings prevented the asset from vesting in Century at the conclusion of the Chapter XI proceedings. Hence Century could assign no claim. The court also held that plaintiffs lacked standing to pursue antitrust actions individually.
 
 
 8
 We reject appellants' preliminary contention that the district court erred in not treating the motion to dismiss as a motion for summary judgment. Appellants claim the trial court considered selected material outside the pleadings, but we think it plain from the record that the court did not do so. In January 1980, appellants moved to treat appellees' prior motion to dismiss as a motion for summary judgment because appellees had attached certain deposition testimony to their supplemental papers in support of the motion to dismiss. On January 8, 1980, the district court granted the motion preliminarily and permitted appellants to file an affidavit of Fred Stein, without further pleadings or discovery. At the hearing on the motion, though, the court indicated it would consider supplementary material only if the motion to dismiss under Fed.R.Civ.P. 12 was not dispositive of the case.
 
 
 9
 In the Memorandum of Decision, the court found it unnecessary to consider the supplemental material submitted by both parties. It granted the motion to dismiss. Appellants concede that the trial court, after considering the supplemental material, could have excluded it. Appellants were not entitled to present supplemental material to defend the dismissal motion. See AMFAC Mortgage Corp. v. Arizona Mall of Tempe, Inc., 583 F.2d 426, 430 & n.3 (9th Cir. 1978); Costen v. Pauline's Sportswear, Inc., 391 F.2d 81, 84 & n.2 (9th Cir. 1968).
 
 I. Century's Unlisted Antitrust Claim
 
 10
 Century did not list the antitrust cause of action against appellees in the arrangement proceeding, and the claim was not brought to the attention of the bankruptcy court. Whether Stein can now proceed to enforce Century's antitrust claim depends on whether the cause of action revested in the bankrupt, Century, despite its failure to list the asset. Former section 70(i) of the Bankruptcy Act, 11 U.S.C. § 110(i) (1976), provided that upon the confirmation of an arrangement or plan in bankruptcy, "the title to the property dealt with shall revest in the bankrupt or debtor." The dispute on appeal centers on whether the antitrust claim can be said to have been "dealt with" in bankruptcy.
 
 
 11
 Appellant asserts that "the property dealt with" refers to all property of the bankrupt, listed or unlisted, because all assets and affairs of the debtor come under the control of the bankruptcy proceedings and bankruptcy court. Appellant attempts to bolster his interpretation by reading section 70(i) in conjunction with Bankruptcy Rule 11-38(f), which applies only to Chapter XI arrangements and which provides that a certified copy of the rearrangement plan and of the order confirming the plan "shall constitute conclusive evidence of the revesting of title to all property in the debtor." 11 U.S.C.App. Rule 11-38(f) (1976).
 
 
 12
 Stein apparently does not seek to enforce the corporate claim solely for himself, but concedes that Century's creditors may have an interest in the suit. Stein states he would proceed in custodia legis, for the benefit of all creditors. Alternatively, he suggests creditors can intervene if they choose.
 
 
 13
 Appellees contend that "property dealt with" means all property administered or listed in bankruptcy. They assert that for this reason appellant has no title to the antitrust claim, and that the proper and sole method of enforcing it is to reopen the bankruptcy proceedings under Rule 515.[2]
 
 
 14
 Courts and commentators have not considered how unlisted assets are to be pursued after the completion of Chapter XI rearrangements. As we discuss below, somewhat greater attention has been paid to the problems arising from assets concealed or not listed in Chapter X bankruptcy proceedings. In Chapter XI rearrangements, unlike Chapter X bankruptcies, no trustee is appointed to wind down and distribute the debtor's estate. The debtor generally remains in possession of its property and carries out the plan of rearrangement under the supervision of the bankruptcy court. After analyzing Chapter X precedents in light of the policies and procedures of Chapter XI, we conclude that Century retained no title to the unlisted claim upon termination of the Chapter XI rearrangement, and that the district court properly held that Stein could not enforce the claim without first petitioning the bankruptcy court to supervise and administer the action.
 
 
 15
 In Chapter X bankruptcies, title to unlisted assets has been controlled by the well-established doctrine of abandonment. By operation of law, the trustee is vested with title to all of the bankrupt's property at the time the bankruptcy petition is filed. 11 U.S.C. § 110(a) (1976); Dallas Cabana, Inc. v. Hyatt Corp., 441 F.2d 865, 867 (5th Cir. 1971). The bankrupt may assert title to assets that have been abandoned by the trustee, in addition to assets administered by the trustee and intended to revest in the debtor. Unless property is abandoned or intentionally revested, title generally remains in the trustee. Abandonment requires affirmative action or some other evidence of intent by the trustee. See United States v. Ivers, 512 F.2d 121, 124 (8th Cir. 1975); Gochenour v. Cleveland Terminals Bldg. Co., 118 F.2d 89, 94 (6th Cir. 1941); St. Paul Fire & Marine Insurance Co. v. United States, 525 F.Supp. 880, 882 (Ct. Int'l Trade 1981); In re Wudrick, 305 F.Supp. 1123, 1127 (C.D.Cal.1969), modified on other grounds, 451 F.2d 988 (9th Cir. 1971) (per curiam). A bankrupt alleging abandonment has the burden of proving at least the trustee's intention to abandon the asset. The emerging rule, moreover, is that leave of the bankruptcy court is required for the trustee to abandon an asset. Riverside Memorial Mausoleum, Inc. v. UMET Trust, 469 F.Supp. 643, 644 (E.D.Pa.1979) (failure of trustee to press claim did not permit Chapter X bankrupt to bring suit without first petitioning bankruptcy court for order of abandonment); see Scharmer v. Carrollton Manufacturing Co., 525 F.2d 95, 98 (6th Cir. 1975); Dallas Cabana, Inc. v. Hyatt Corp., 441 F.2d at 868 & n.10; St. Paul Fire & Marine Insurance Co., 525 F.Supp. at 882.
 
 
 16
 In cases which concern ownership of assets not listed in Chapter X bankruptcies, the courts reason that abandonment results only when the trustee knows of the existence of the property, so that, at the least, an intent to disclaim can be inferred. When the bankrupt fails to list an asset, he cannot claim abandonment because the trustee has had no opportunity to pursue the claim. These principles were first established by the Supreme Court in First National Bank v. Lasater, 196 U.S. 115, 25 S.Ct. 206, 49 L.Ed. 408 (1905), in which a plaintiff sought to enforce a claim for usury two months after he had received a discharge in bankruptcy and after the trustee had been discharged. The Court held that because the debtor failed to notify either the trustee or the creditors of the claim, the doctrine of abandonment did not apply, and title did not revest in the debtor.
 
 
 17
 It cannot be that a bankrupt, by omitting to schedule and withholding from his trustee all knowledge of certain property, can, after his estate in bankruptcy has been finally closed up, immediately thereafter assert title to the property on the ground that the trustee had never taken any action in respect to it. If the claim was of value ... it was something to which the creditors were entitled, and this bankrupt could not, by withholding knowledge of its existence, obtain a release from his debts and still assert title to the property.
 
 
 18
 Id. at 119, 25 S.Ct. at 208.
 
 
 19
 Courts, invoking Lasater, generally have not permitted parties asserting title to unlisted causes of action to enforce the claim, because they cannot demonstrate abandonment by the trustee. See Management Investors v. United Mine Workers of America, 610 F.2d 384, 392 (6th Cir. 1979); Scharmer v. Carrollton Manufacturing Co., 525 F.2d 95, 98-99 (6th Cir. 1975); Burkett v. Shell Oil Co., 448 F.2d 59 (5th Cir. 1971) (per curiam) (facts set out in subsequent related case at 487 F.2d 1308, 1309-10); Dallas Cabana, Inc. v. Hyatt Corp., 441 F.2d 865 (5th Cir. 1971); In re Thomas, 204 F.2d 788, 793-94 (7th Cir. 1953); Fazakerly v. E. Kahn's Sons Co., 75 F.2d 110, 114 (5th Cir. 1935); St. Paul Fire & Marine Insurance Co., 525 F.Supp. 880, 882 (Ct.Int'l Trade 1981); Moore v. Slonim, 426 F.Supp. 524, 527-28 (D.Conn.), aff'd mem., 562 F.2d 38 (2d Cir. 1977); Hermsmeyer v. A.L.D., Inc., 239 F.Supp. 740 (D.Colo.1964); cf. Wallace v. Lawrence Warehouse Co., 338 F.2d 392 (9th Cir. 1964) (once trustee was appointed, debtor in possession who had brought appeal lost standing to prosecute appeal).
 
 
 20
 As demonstrated in the first two cases cited above, the Sixth Circuit has applied the principle enunciated in Lasater most explicitly to recent Chapter X proceedings. In Scharmer v. Carrollton Manufacturing Co., supra, a former officer, director, and owner of most of the shares of a corporation that had been discharged in Chapter X proceedings sought to enforce causes of action for antitrust violations and related matters against outside parties on the authority of a corporate resolution assigning to him any rights and assets owned by the bankrupt after discharge. Relying on Lasater, the court held that the doctrine of abandonment did not apply because the claims were unscheduled and the bankruptcy court had not authorized abandonment. The Court held the proper procedure would have been a petition to the bankruptcy court to reopen proceedings and determine whether the claims should be administered or abandoned. Because Scharmer chose a "more circuitous route," the corporation was never revested with title to the claims and the alleged assignment was a nullity. 525 F.2d at 99. The Sixth Circuit followed the same theory in Management Investors v. United Mine Workers of America, supra.
 
 
 21
 The position adopted by the Sixth Circuit as an interpretation of Lasater is the more widely accepted view, as the cases cited above indicate, though a minority of courts have permitted Chapter X bankrupts to assert sufficient title to bring suit against third parties on unlisted claims, at least until creditors petition the bankruptcy court to reopen and a trustee is appointed. See, e.g., Heywood-Wakefield Co. v. Small, 96 F.2d 496, 500-01 (1st Cir. 1938) (suit for patent infringement); Mills Novelty Co. v. Monarch Tool & Mfg. Co., 49 F.2d 28 (6th Cir.), cert. denied, 284 U.S. 662, 52 S.Ct. 37, 76 L.Ed. 561 (1931) (same); Loose v. Brubacher, 219 Kan. 727, 549 P.2d 991 (1976) (interest in land); McAulton v. Smart, 54 Haw. 488, 510 P.2d 93 (1973) (same); People v. Cole Check Service, Inc., 175 Cal.App.2d 777, 346 P.2d 838 (Dist.Ct.App.1959).
 
 
 22
 In the present case we are faced with a bankrupt's claim to a cause of action not listed in a Chapter XI bankruptcy. Chapter XI proceedings, in which the debtor remains in possession, present a stronger case for preventing bankrupts from asserting title to unlisted assets than in Chapter X cases such as Lasater and Scharmer.
 
 
 23
 Appellant contends that because the debtor remains in possession during Chapter XI rearrangement and because no trustee is appointed, it must follow that all property of the bankrupt, whether administered or unlisted, should revest in the bankrupt. This mischaracterizes the debtor's status. As a debtor in possession, the Chapter XI bankrupt holds the title and powers of trustee, subject at all times to the control of the court. 11 U.S.C. § 742 (1976); see In re Southland Supply, Inc., 657 F.2d 1076, 1080 (9th Cir. 1981); Wallace v. Lawrence Warehouse Co., 338 F.2d 392, 393 (9th Cir. 1964). The debtor in possession is a fiduciary, and owes the same duties as a trustee. Gochenour v. Cleveland Terminals Bldg. Co., 118 F.2d 89, 93 (6th Cir. 1941). The debtor in possession is strictly supervised by the bankruptcy court, and his actions, including abandonment, must be approved. The bankrupt does not act in his own interests until he reverts to his former status upon discharge and confirmation of the plan. The extent of the fiduciary duties should not vary with the identity of the one who performs that role.
 
 
 24
 The dangers resulting from the concealment of assets are greater when the debtor remains in possession than in cases in which a third party acts as trustee. An outside trustee is a separate mechanism for discovering unlisted claims or assets. If a debtor in possession were permitted to omit claims in bankruptcy and later assert title to them, there might be an inducement to do so, to the prejudice of creditors' interests. Such a rule would undermine the fiduciary status of the debtor in possession. Whether or not the failure to list the asset in the case before us was intentional, the opportunity for concealment must be considered in formulating the proper general rule.
 
 
 25
 The post-Lasater Supreme Court case, Danciger & Emerich Oil Co. v. Smith, 276 U.S. 542, 48 S.Ct. 344, 72 L.Ed. 681 (1928), does not suggest a result different from that in Lasater in debtor in possession cases. In Danciger, the bankrupt sought to enforce a claim after he had received a discharge in a voluntary proceeding in which he did not mention the claim and in which no trustee had been appointed because there were no other assets. The Court held that the bankrupt was the owner of the claim and could assert title to it, because no trustee had been appointed and property remains in the debtor until such time. The Court held that the Lasater doctrine did not apply because there a trustee had been appointed "to whom the right of action had passed." Id. at 547, 48 S.Ct. at 345. We conclude Danciger's holding does not apply to Chapter XI cases in which the debtor remains in possession. A debtor in possession holds title to property as a fiduciary for the creditors, as in Lasater. In Danciger a trustee had not been appointed and the bankrupt was not acting as a trustee and had no fiduciary obligation, at least under the statutory scheme.
 
 
 26
 We hold that in Chapter XI proceedings, "property dealt with" refers to property administered or listed in the bankruptcy proceedings and supervised by the bankruptcy court, and therefore only such property reverts to the bankrupt upon termination of the bankruptcy proceedings.
 
 
 27
 Rule 11-38(f), providing that the certified copy of the Chapter XI plan and order constitutes conclusive evidence of the revesting of title to all property in the debtor, has evidentiary effect only. It simply means that the Chapter XI plan constitutes conclusive evidence of the revesting of title to all property in the debtor that was dealt with properly in the bankruptcy. The proper procedure to enforce any newly discovered asset neither listed nor abandoned by the debtor in possession is to petition the bankruptcy court to reopen the proceedings under Rule 515 to permit the court to decide whether reopening is desirable and, if so, whether the claim is to be administered for the benefit of creditors or abandoned. If the claim is to be enforced for the estate, a trustee will be appointed for its enforcement. The title to the antitrust claims that were not listed in Century's Chapter XI proceedings did not revest in Century upon its discharge in bankruptcy, and the assignment to Stein was a nullity.
 
 
 28
 Stein seeks to sue in custodia legis for the benefit of creditors, contending that until a trustee is again appointed, the bankrupt is the only existing entity who may hold title to the asset. This misconceives the nature of the bankruptcy estate. Property of the bankrupt remains in custodia legis in the bankruptcy court during the period in which no trustee has been appointed and after the discharge of the trustee, United States v. Ivers, 512 F.2d 121, 124 (8th Cir. 1975); Stanolind Oil & Gas Co. v. Logan, 92 F.2d 28, 31 (5th Cir. 1937), cert. denied, 302 U.S. 763, 58 S.Ct. 409, 82 L.Ed. 592 (1938), but title need not reside in a physical entity. Title may remain dormant, in the estate, until the bankruptcy court again appoints a trustee as enforcing guardian. Stanolind Oil & Gas Co., 92 F.2d at 31. Without petitioning the bankruptcy court, Stein cannot resurrect the estate to proceed in custodia legis. Similarly, Stein may not proceed for the benefit of creditors. The creditors themselves could not have proceeded to enforce Century's antitrust claims without having obtained leave of the bankruptcy court, so Stein is in no better position by proceeding in their name. See Management Investors v. United Mine Workers of America, 610 F.2d 384, 393 (6th Cir. 1979); Dallas Cabana, Inc. v. Hyatt Corp., 441 F.2d 865, 868 (5th Cir. 1971); Gochenour v. Cleveland Terminals Bldg. Co., 118 F.2d 89, 94-95 (6th Cir. 1941); St. Paul Fire & Marine Insurance Co., 525 F.Supp. 880, 882 (Ct. Int'l Trade 1981); Gochenour v. George & Francis Ball Foundation, 35 F.Supp. 508 (S.D.Ind.1940), aff'd, 117 F.2d 259 (7th Cir. 1941) (per curiam).
 
 
 29
 We also reject Stein's final argument that the alleged antitrust tortfeasors are not the proper parties to raise the bankruptcy proceedings as a defense. The right to sue goes to the essential merits of the claim, as the identity of the injured party relates directly to the measure of damages and under general standing principles only the injured party ensures the adversary interest necessary to prosecute the suit. The defendants in the district court were entitled to contend that Stein lacked title to the claim he was asserting.
 
 
 30
 Appellants do not specifically argue, but underlying their appeal is the implicit claim, that the district court should not have dismissed the claim without prejudice but rather should have stayed the case so that the bankruptcy proceedings could be reopened, a trustee appointed, and the trustee joined in the suit as plaintiff. In fact, ordering a stay on plaintiff's motion is the most sensible solution to the problems presented by this type of case. A stay would enable a trustee to intervene on behalf of creditors while at the same time permitting appellant's allegations of antitrust violations to be fully adjudicated. The only parties benefiting from the absence of a stay are those accused of violating the antitrust laws. In the case at hand, however, appellants did not petition the district court for a stay. The estate here has already been resolved, and the debtor in possession has been relieved of its duties as trustee. While on first impression we likely would have stayed the assigned claim pending a decision by the bankruptcy court, we cannot say that the trial court-in the absence of a motion for a stay by appellants-abused its discretion in dismissing the cause of action. Management Investors, v. United Mine Workers of America, 610 F.2d at 392-93.
 
 
 31
 We recognize that the dismissal of the corporate claim raises the possibility that the antitrust defendants will go free because of the bar of the statute of limitations, though we intimate no opinion on that issue. If this is the case, it is not the result of the rules that have been established for the sound administration of bankruptcy estates and proceedings. "(T)he predicament in which (appellant) now finds himself is the result of his never having listed this right of action as an asset of his bankruptcy estate or otherwise brought it to the trustee's attention." Management Investors v. United Mine Workers of America, 610 F.2d at 393. The dismissal of Stein's assigned corporate claim was proper.
 
 II. The Individual Antitrust Claims
 
 32
 In the first amended complaint appellants alleged a conspiracy operated to deprive Century of first-run motion pictures so that Stein would be forced to sell Century stock to some individual appellees at a depressed price. Appellants also claimed the unavailability of films caused corporate losses which in turn were passed on to appellants as guarantors of corporate loans. The trial court dismissed these individual causes of action on the ground that the Steins had no standing to sue as shareholders or creditors. The court found that the only injury alleged other than that resulting from a ripple effect was the forcing of Stein to sell an interest in Century, but that because there was no allegation that any such sale was made, the conspiracy did not have a direct effect on Stein. On motion for reconsideration, Stein attempted to amend his complaint to allege that he later sold 49 percent of Century's stock to an outside person for a depressed price of $10,000. The trial court denied the motion, stating that Stein's losses still were derivative of those sustained by the corporation.
 
 
 33
 Stein's standing to challenge appellees' alleged anticompetitive conduct raises a difficult issue that must be resolved by considering the factual allegations in light of the Supreme Court's two limitations on antitrust recovery, those of remoteness and duplicate recovery. We conclude that Stein has not alleged an antitrust claim upon which he may personally recover.
 
 
 34
 Despite the broad language of section 4 of the Clayton Act, that "(a)ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" shall be permitted to sue for treble damages, 15 U.S.C. § 15 (1976), district and appellate courts have interpreted "by reason of" to impose a requirement of legal causation on a plaintiff's claim before granting standing to proceed. The Supreme Court has recognized that there is a point beyond which injuries are too remote to warrant wrongdoer liability, though it has declined to evaluate the application of any particular test to measure remoteness. Blue Shield of Virginia v. McCready, --- U.S. ----, ---- & n.12, 102 S.Ct. 2540, 2546-48 & n.12, 73 L.Ed.2d 149 (1982); cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (injury must be "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"). This circuit has long analyzed the remoteness of antitrust challenges under the "target area" test first enunciated in Conference of Studio Unions v. Loew's Inc., 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952) and adopted most clearly in In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973), under which plaintiff must allege injury "in the area of the economy in which the elimination of competition occurred," 481 F.2d at 128. See, e.g., Thomsen v. Western Electric Co., 680 F.2d 1263, 1267 (9th Cir. 1982); California State Council of Carpenters v. Associated General Contractors of California, Inc., 648 F.2d 527, 537 (9th Cir. 1980), cert. granted, 454 U.S. 1141, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982); Solinger v. A & M Records, Inc., 586 F.2d 1304, 1310 (9th Cir. 1978), cert. denied, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979); Bosse v. Crowell, Collier & MacMillan, 565 F.2d 602, 606 (9th Cir. 1977); John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495, 499 (1977); Blankenship v. Hearst Co., 519 F.2d 418, 425-26 (9th Cir. 1975).
 
 
 35
 Appellant challenges a principal boycott against Century, the corporate motion picture distributor, because appellees allegedly deprived Century of the opportunity to bid for, to negotiate for, or to obtain first-run motion pictures. Although appellant himself was not in the threatened market for the distribution and licensing of first-run motion pictures, his standing under the target area test cannot be precluded at the outset. Appellant's case presents an aspect requiring careful scrutiny. Stein claims that appellees boycotted Century in order to depress the price of the shares, to force Stein to sell a one-half interest in Century, and to eliminate Stein from the business of exhibiting motion pictures. We need not decide, though, whether this additional contention brings Stein within that area of the economy "endangered by a breakdown of competitive conditions in a particular industry," In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d at 129; see McCready, --- U.S. at ----, 102 S.Ct. at 2549 (citing language). We need not, in the Supreme Court's remoteness formulation, examine the "physical and economic nexus between the alleged violation and the harm to the plaintiff," and "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned ... in providing a private remedy under § 4," McCready, --- U.S. at ----, 102 S.Ct. at 2548, because we find that granting Stein standing would violate the second statutory policy limitation on antitrust recovery, that of double recovery, see id. at ----, 102 S.Ct. at 2546.
 
 
 36
 The Supreme Court first expressed this policy in Hawaii v. Standard Oil Co., 405 U.S. 251, 262-64, 92 S.Ct. 885, 891-892, 31 L.Ed.2d 184 (1972), when it denied Hawaii standing to sue for injury to the state's general economy arising from anticompetitive activity, in part because it was unwilling to "open the door to duplicative recoveries." The Court enforced this limitation most clearly in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The Court there denied standing to an indirect purchaser who alleged that illegal anticompetitive overcharges had been passed on to it, because allowing such recovery would create a "serious risk of multiple liability for defendants." Id. at 730-31, 97 S.Ct. at 2066-2067. See generally Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term-1977, 77 Colum.L.Rev. 979, 989-1004 (1977) (discussing related doctrines of standing, antitrust injury, and passed-on damages).
 
 
 37
 Hawaii and Illinois Brick thus "focused on the risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." McCready, --- U.S. at ----, 102 S.Ct. at 2546. The prevention of possibly duplicate recoveries supports limiting the section 4 remedy. Id.; see Mid-West Paper Products Co. v. Continental Group, 596 F.2d 573, 583 (3d Cir. 1979); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292, 1295 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972); Ames v. American Telephone & Telegraph Co., 166 F. 820, 823 (C.C.D.Mass.1909); Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 850-51 (1977).
 
 
 38
 Preliminarily, under this policy against multiple liability for passed on injury, the Steins have no standing as creditors or guarantors of Century, because their losses in these respects simply reflect the injury to the corporation, which forced it to default on the loans.[3] Stein's status as shareholder invokes a similar policy.
 
 
 39
 We have previously denied standing to injured creditors, employees, and shareholders of corporations against which anticompetitive conduct was directed. In Solinger v. A & M Records, Inc., 586 F.2d 1304 (9th Cir. 1978), cert. denied, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979), for example, we rejected the challenge of the president of an independent distributor of phonographic records and tape-recordings against two large manufacturers of recordings for their alleged anticompetitive territorial allocation scheme, which drove the distributor from the market. As an employee of the company, the plaintiff lacked standing because his loss of salary was not within that area of the economy the antitrust laws were designed to protect, id. at 1311. We noted that shareholders, officers, and employees of corporations are generally denied standing to sue, id. at 1311 n.8 (citing cases). See Program Engineering, Inc. v. Triangle Publications, Inc., 634 F.2d 1188 (9th Cir. 1980) (president of publisher of racing guide has no standing to challenge attempt by other publishers to monopolize market); Sherman v. British Leyland Motors, Ltd., 601 F.2d 429 (9th Cir. 1979) (president and sole shareholder of franchised automobile dealer could not maintain antitrust suit against automobile manufacturer and distributors for a distributorship reallocation scheme that resulted in the termination of the franchise, even though corporation became indebted to president on guarantees); cf. Gutierrez v. E. & J. Gallo Winery Co., Inc., 604 F.2d 645 (9th Cir. 1979) (loss of work arising from an alleged conspiracy to limit production and sale of produce is not sufficient to grant employees standing to challenge antitrust conspiracy); Contreras v. Grower Shipper Vegetable Association of Central California, 484 F.2d 1346 (9th Cir. 1973) (per curiam), cert. denied, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974) (same). Other circuits also generally deny stockholders and employees standing because the competitive injury is to the corporation. See, e.g., Jones v. Ford Motor Co., 599 F.2d 394 (10th Cir. 1979); Bravman v. Bassett Furniture Industries, Inc., 552 F.2d 90, 97-99 (3d Cir.), cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977) (discussing Third Circuit's corporate shareholder/officer standing cases); Pitchford v. PEPI, Inc., 531 F.2d 92 (3d Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1131 (5th Cir. 1975); Mendenhall v. Fleming Co., 504 F.2d 879 (5th Cir. 1974); Martens v. Barrett, 245 F.2d 844 (5th Cir. 1957). See generally Sherman, Antitrust Standing: From Loeb to Malamud, 51 N.Y.U.L.Rev. 374, 378-80 (1976).
 
 
 40
 The prohibition against shareholder standing in the above cases is premised on the prohibition against duplicate recovery, in addition to considerations of remoteness. If the corporation is injured by an antitrust conspiracy or violation, the corporation is the proper party to sue, and injured shareholders and creditors of the corporation recover their losses from the corporation's recovery, as it is distributed or as reflected in stock prices. United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917); see Scharmer v. Carrollton Manufacturing Co., 525 F.2d 95, 100 (6th Cir. 1975); Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir. 1968). If shareholders were permitted to recover their losses directly, there would be the possibility of a double recovery, once by the shareholder and again by the corporation.[4]
 
 
 41
 Stein's claimed loss in depressed share prices directly reflected his share in the total depressed value of the corporation. His proper recourse would be to await the corporate suit, or to sue derivatively on behalf of the corporation to recover the corporation's losses. See Bravman v. Bassett Furniture Industries, Inc., 552 F.2d at 97; Berger & Bernstein, supra, 86 Yale L.J. at 814, 862-63.
 
 
 42
 The threat of double recovery exists even though Stein has alleged that the conspiracy was intended to or directed at injuring the corporation in order to drive him out of the industry as a shareholder. Regardless of whether the conspiracy was focused on Stein or Century, which might affect the policies behind the remoteness limitation embodied in our target area test, the conspiracy was carried out against the corporation, in the market for first-run motion pictures. In cases alleging that securities violations were committed against a corporation in order to depress its share prices, for example, such as to facilitate a tender offer, shareholders may only sue on behalf of the corporation for its damages. Cf., Madigan, Inc. v. Goodman, 498 F.2d 233, 239 (7th Cir. 1974). Although previous shareholder cases have not considered contentions that the boycott was intended to drive out the shareholder, that it would make no difference implicitly underlies our denial of standing in both Solinger and Program Engineering, though it is true that in those cases the corporation, not the plaintiff, was conceded to be the principal target.
 
 
 43
 Our recent decision in Ostrofe v. H.S. Crocker Co., 670 F.2d 1378 (9th Cir. 1982), does not support Stein's standing for the above reason. In that case we considered only the policy against remoteness, not double recovery. The injury suffered by the employee in that case was not shared by the corporation or any injured party; it entailed loss of salary. We emphasized that permitting Ostrofe to sue would have no "negative consequences that might counsel denial of standing," because "(t)here is no danger of duplicative recovery. The damages done to such an employee are done to him alone; the damages he sustains are not passed on, nor possibly included in the losses of others." Id. at 1385 (footnote citing Illinois Brick omitted). Unlike Ostrofe, that danger of double recovery is manifest here.
 
 
 44
 The antitrust conspiracy was carried out against Century, not against Stein as a shareholder such that he suffered unique injury not shared by the corporation. A shareholder might have standing, for example, if he alleged he was injured by a boycott in the market for the sale of the shares of the corporation which depressed the price of the shares artificially without injuring the corporation. Cf., Peter v. Western Newspaper Union, 200 F.2d 867, 872 (5th Cir. 1953); Kolb v. Chrysler Corp., 357 F.Supp. 504, 507 (E.D.Wisc.1973). Stein alleged inimical antitrust injury only to the corporation; his losses from depressed share values mirror the corporate injury.[5]
 
 
 45
 We must note that Stein's initial complaint did not contain a specific prayer for relief for the loss in share value, and only alleged in a single paragraph a conspiracy against Century to force Stein to sell part of his shares. Stein's attempted clarifications were contained in an amended complaint submitted with a motion for reconsideration after the trial court had heard and granted dismissal motions. The district court did not abuse its discretion in refusing to permit such late amendment. Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 131 (9th Cir. 1982); Jordan v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982). As in Mende and Jordan, here Stein provided no satisfactory explanation for his failure to fully develop his contentions originally, and the amended complaint was brought only to assert new theories, if anything, and was not premised upon new facts. Even construing Stein's allegations most broadly and accepting his view of the conspiracy, though, we are constrained to deny Stein standing as an individual to challenge appellees' conduct. Stein, under any of his theories, cannot show that he has suffered losses not reflective of those suffered by Century.
 
 
 46
 The dismissal of appellants' individual claims as creditors and shareholders, along with the dismissal of Century's assigned claim, must be AFFIRMED.
 
 
 
 *
 Honorable Walter Early Craig, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Century obtained rearrangement under former Chapter XI of the Bankruptcy Act of July 1, 1898, ch. 541, §§ 301-99, 30 Stat. 544 (formerly codified at 11 U.S.C. §§ 701-99 (1976)), repealed, Act of Nov. 6, 1978, Pub.L. No. 95-598, tit. IV, § 401(a), 92 Stat. 2549, 2682 (1978). See generally In re Southland Supply, Inc., 657 F.2d 1076, 1078 n.1 (9th Cir. 1981) (describing former Chapter XI proceeding). The 1978 Act provides that cases commenced under the former Bankruptcy Act and matters relating to such cases are to be determined by the former Act. Pub.L. No. 95-598, tit. IV, § 403(a), 92 Stat. 2683 (1978). The provisions and principles discussed in this opinion refer to the former Act
 
 
 [2]
 A case may be reopened on application by the bankrupt or other person to administer assets, to accord relief to the bankrupt, or for other good cause. The application shall be filed with the clerk of the district court having custody of the papers in the case. The case shall be referred forthwith for action on the application and for further proceedings therein
 11 U.S.C. App. Rule 515 (1976).
 
 
 [3]
 Appellants contend their losses are different from those suffered by the corporation. The losses on the guarantees are derivative of those of the corporation, and the corporation's complete recovery of its antitrust losses would enable it to repay the debt to appellants resulting from the guarantee payments
 
 
 [4]
 Although it could be argued there would be no double recovery if antitrust defendants in suits by the corporation were permitted to set off damages paid earlier to individual shareholders, such a rule is undesirable for policy reasons apart from the general principle that the corporation is the proper party to sue to redress its injury. Permitting shareholders to recover directly from antitrust violators would, in effect, permit such defendants to achieve a forced liquidation. The corporation must exercise the power to decide whether to continue in the corporate form or to distribute its assets after being made whole for its anticompetitive losses. More importantly, allowing shareholder recovery would present complicated computations of damages based on fluctuations in share values, and the possibility of multiple suits and parties with little incentive to sue. These were the factors the Court in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), relied upon in rejecting the defense that indirect rather than direct purchasers who had passed on their injury were the parties injured by the antitrust violation
 
 
 [5]
 We agree with appellant that whether he actually sold his shares to appellees, or even to anyone, is irrelevant, contrary to any intimation by the district court that Stein had not shown that the conspiracy had a "direct effect" on him. Stein could demonstrate actual injury in the form of depressed prices by various means, as he did by alleging that he later sold the shares at depressed prices. The defect in Stein's standing lies not in his lack of actual injury but his lack of unique non-derivative injury caused by the antitrust boycott