STRUTHERS SCIENTIFIC & INTERNA-
TIONAL CORPORATION, Plaintiff-
Appellee,

v.

RAPPL & HOENIG CO., Inc., Defendant-
Appellant.

No. 203, Docket 71-1692.

United States Court of Appeals,
Second Circuit.

Argued Oct. 28, 1971.

Decided Jan. 4, 1972.

Eugene F. Buell, Blenko, Leonard & Buell, Pittsburgh, Pa. (Paul A. Beck, Blenko, Leonard & Buell, Pittsburgh, Pa., Delon F. Mousaw, Martin, Dutcher, Cooke, Mousaw & Vigdor, Rochester, N. Y., of counsel), for defendant-appellant.

William A. Drucker, New York City (Peter L. Tailer, New York City, James M. Hartman, Harris, Beach & Wilcox, Rochester, N. Y., of counsel), for plaintiff-appellee.

Before LUMBARD, HAYS and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal involves the validity of patents on an autoclaving device (No. 3,423,805) and a method of autoclaving concrete blocks (No. 3,275,724). An autoclave, for those uninitiated in the art, is a "strong metallic vessel, gas-tight when closed, used for heating liquids under pressure." Webster's New International Dictionary 156 (1929).

The patents in question initially were issued, effective June 1960, to John B. Klingel, who later assigned them to plaintiff-appellee, Struthers Scientific & International Corporation. Throughout the ensuing infringement action, defendant-appellant's defenses were several, but we focus primarily on two relating to the invalidity of the Klingel patents. First, appellant contends that under 35 U.S.C. § 103 the alleged inventions were, to a person with ordinary skill in the art, an obvious step from the prior art, particularly the J. F. Gschwind patent (No. 2,260,710) entitled "Autoclave and the Like." Appellant's second major claim is that, within the meaning of 35 U.S.C. § 102(b), the inventions were "described in a printed publication" by virtue of an article which appeared in *Concrete* magazine some 14 months before public use or sale in this country.

It is helpful in understanding the art, and hence the claims in conflict here, Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), to commence with a functional description of the simple but analogous household pressure cooker. Water is placed in the bottom of the cooker and the lid is locked tight; heat from the stove burner causes the water to evaporate into steam, gradually increasing the pressure and the temperature within the cooker, cooking the food. Opening the vent releases the pressure, permitting the lid to be opened and the food removed. From time to time, if additional cooking is desired, more water must be added to the bottom of the cooker to replace that which has escaped in vapor form through the opened vent or upon opening the lid.

A simple autoclave may be described as a glorified pressure cooker in which, by way of illustration, building blocks are cured by steam, with the blocks being transported in and out of a metallic vessel, typically 130 feet long and 10 feet in diameter, on a conveyor or a flat bed carriage on tracks, and with the heat being applied to water to create steam, which is fed into the "gas-tight," "closed" vessel. The autoclaving process is used for a variety of purposes, such as vulcanizing, impregnating wood, curing plastics and bonding aluminum, but no invention is claimed here for any particular use. Rather, this case turns on the method of applying heat to the water in the vessel, the use or nonuse of live steam, and the recovery and reuse of condensate in the autoclaving process.

Gschwind claimed to have advanced the autoclaving art in two or three ways. Aiming primarily at improving rubber vulcanization, he found that the principal difficulties with prior autoclaves or other similar closed chambers

stemmed from the custom of "introducing live steam directly into such chamber." This results, he said, in the contamination and loss of condensate, loss of heat, super-heating of the steam, and the necessity of continuous venting. His claims of invention to meet these problems related principally to the means for supplying heat to the vessel. The involved the use of a heating coil in the bottom of the vessel to heat the water and the admission of live steam into the vessel "in its upper portion," with the condensate flowing to the bottom of the vessel to be re-evaporated. An outlet with a steam trap in it led from the bottom of Gschwind's vessel to permit escape of excess condensate. The vent at the top of vessel was to be open during the "heating up" period but when the desired temperature and pressure—the so-called "curing period"—was reached, the vent was to be closed and no more air admitted.

The device patent ('805) and the method patent ('724) here in suit both claim the benefit of the filing date of June 20, 1960, in accord with 35 U.S.C. § 120 as continuations in whole or in part of an abandoned filing of that date. Both '805 and '724 were concededly taken out by Klingel, and while both point to particular utility in the curing of concrete blocks, neither was so limited, but extended to "the steam treating of other articles." As did Gschwind's, the Klingel patents provide for a reservoir at the bottom of the vessel (in each case a dam at the door end); heating coils supplied with hot oil or other fluid medium (Klingel) or a "heating medium" (Gschwind) to heat and vaporize the water in the bottom of the vessel; the recycling of condensate from the sides of the vessel effected by the combination of gravity and reheating at the bottom; and the recovery and reuse of condensate with consequent avoidance of heat and water loss.

The Klingel patents, however, are claimed to differ from Gschwind in two aspects. One is the provision for a storage tank adjacent to the Klingel autoclave. By opening a valve in the pipe from the autoclave to the storage tank after the holding cycle (equivalent to Gschwind's "curing cycle"), the pressure in the autoclave and tank is equalized; hot water from the autoclave is then pumped into the storage tank and the valve closed. On the second and remaining cycles, when a fresh batch of blocks is to be cured, the hot water in the storage tank is pumped back into the autoclave where, because of its pressure and heat, the water "immediately flashes into steam." The second difference claimed by Klingel is the avoidance of any injection of live steam into the vessel, which is a concomitant of steam being generated solely within the autoclave device itself. No claim of novelty is made now, nor could it be, regarding the reservoir and dam in the bottom of the autoclave, the use of indirect heating or the reuse of condensate.

Gschwind and Klingel use the same process—curing by steam in a pressurized container. We view them as doing so essentially by the same method—indirect heating by coils or a jacket of a reservoir of water automatically maintained within the autoclave, with consequent reuse of condensate formed within the vessel. They differ in that on the first or opening curing cycle Gschwind injects live steam into the vessel while Klingel does not. This difference is not invention, nor is any claim of a better resultant product made for it within the walls of the Klingel patents, even though subsequent testimony of Klingel's makes a case for such a claim. Gschwind points out that exclusive use of indirect heating is "often not practicable because of excessive equipment cost, limited space for coils or jackets or a high pressure involved." But Klingel does not use indirect heating exclusively except on his first cycle. In subsequent cycles, water repumped into the vessel from Klingel's storage tank "immediately flashes into steam."

Plaintiff-appellee makes the two points that the injection of live steam would result in inferior concrete blocks

and that even if Gschwind's live steam and Klingel's superheated water "flashing into steam" are, after the first complete cycle, substantially the same, Gschwind's steam comes from the top while Klingel's comes from the bottom. As to the first point, "live steam" is "live steam" whether it immediately flashes in the vessel or enters "live." As to the second point, Klingel in his deposition before trial conceded that it would not make "any difference to the operation of [his] autoclave if you introduced steam at the same time you were circulating the hot oil . . ."; the live steam would heat up the autoclave quicker, he argued, but "it would be defeating the purpose." This and other testimony, read with Klingel's claims, indicates plainly that the primary purpose of his patents was to avoid use of a high pressure boiler and firing. True, Klingel subsequently testified at trial regarding the deleterious effects of live steam upon the curing of concrete block, viz., that high temperature steam mixed with too much air causes superheating (low relative humidity or dehydration), which tends to evaporate water from the concrete block, drawing cement to the outside of the block and thus causing brittleness and mottled coloring. This testimony, however, refers to a pure steam injection system or one in which live steam is introduced at the beginning of a cycle with *cold water* over the coils and the heating mechanism only then turned on. Gschwind's reason for releasing any live steam into the vessel in combination with the indirect heat is to assure "a quick rise in pressure and temperature," and to avoid cost problems in exclusive indirect heating. He recognizes superheated steam as an undesirable feature occurring when steam is throttled from the high pressure of an outside boiler to the lower pressure of the vessel. Consequently the sequence of indirect heating and introduction of live steam is no part of his device. The fact that on cycles subsequent to the first, the patents in suit seemingly permit of immediate flashing of steam upon the return of used water and condensate to the reservoir, appears to us to constitute essentially the same process as envisioned by Gschwind applied to the slightly different problem of curing concrete blocks rather than vulcanizing rubber, although as we have said none of the patents is so limited in scope.

If the place from which the live steam emanates has any significance it is in the "careful control of the expulsion of air from the autoclave device," as the trial court found, a finding on which plaintiff-appellee relies. The Klingel patents, however, make no claim in this respect; if this were the key, they would therefore fail for insufficient specification under 35 U.S.C. § ·112. Norton Co. v. Bendix Corp., 449 F.2d 553 (2d Cir. 1971); Schmidinger v. Welsh, 383 F.2d 455, 462 (3rd Cir. 1967), cert. denied, 390 U.S. 946, 88 S. Ct. 1031, 19 L.Ed.2d 1134 (1968); Tinnerman Products, Inc. v. George K. Garrett Co., 292 F.2d 137, 140 (3rd Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961); Koehring Co. v. National Automatic Tool Co., 257 F.Supp. 282, 287 (S.D.Ind.1966), aff'd, 385 F.2d 414 (7th Cir. 1967). And if elimination of air were crucially important, it must be recalled that Gschwind does teach that the vent is closed after the heating up period is concluded and the air and gas are eliminated.

We conclude therefore that Klingel's avoidance of injection of any live steam on the first cycle and, hence, his total independence from the use of any external boiler—the essence of his patents—was a logical step from the prior art as exemplified in Gschwind. In reaching this conclusion, necessarily we must resolve the level of ordinary skill in the art of autoclaving to determine whether 35 U.S.C. § 103 constitutes a defense. Graham v. John Deere Co., *supra*. We take note of appellant's argument that findings which too closely parallel the plaintiff's proposed findings are not as binding upon us as they might otherwise be. Rooted Hair, Inc.

v. Ideal Toy Corp., 329 F.2d 761, 769 (2d Cir.) (concurring opinion), cert. denied, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed. 2d 40 (1964). We do, however, consider those findings and the evaluation of the witnesses' testimony in the light of a misapprehension, apparent from the findings and transcript, that the patents in suit related solely to autoclaving concrete block. The trial court found, for example, that:

> Klingel's conception and contribution to the art was not obvious in view of the failures of others prior to Klingel to solve the problems of case-hardening, inconsistency in color, inconsistency in strength and hardness, undue chipping, cracking, and glazing of concrete blocks.

While it may be that the Klingel method had the effect of curing these problems, trade acceptance of the plaintiff-appellee's autoclaves apparently being broad, no claim was made in the Klingel patents to such an effect. Rather, the patents were directed at eliminating the requirement of "a licensed fireman or stationary engineer" by the indirect heating mechanism, at water and heat savings from the recovery and reuse of condensate, and at economical chemical treatment of the water to minimize corrosion. All of these practical advantages were corollaries of making Gschwind's application of indirect heating exclusive. The recovery and reuse of condensate by way of a storage tank in Klingel is but a logical extension of Gschwind's "outlet pipe . . . equipped with a steam trap which prevents any evacuation of vapor, but acts as an overflow for condensate . . . ." Furthermore, the evidence leaves no doubt that the use of oil heated by a fired heater and transferred to another area for heating purposes was a principle old in 1958.

The testimony of Dr. Romualdi supports directly the inference that we draw from the record and an examination of the prior art, the patents in suit and the exhibits, viz., that the Klingel improvements in the art of autoclaving would have been obvious to a person with ordinary skill armed with the teaching of Gschwind and some common knowledge. This invalidates the invention. 35 U.S.C. § 103; Graham v. John Deere Co., *supra*; Ralston Purina Co. v. General Foods Corp., 442 F.2d 389 (8th Cir. 1971); Rockwell v. Midland-Ross Corp., 438 F.2d 645 (7th Cir. 1971); Blair v. Dowd's, Inc., 141 U.S.App.D.C. 295, 438 F.2d 136 (1970); Scott Paper Co. v. Fort Howard Paper Co., 432 F.2d 1198 (7th Cir. 1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971); Burgess Cellulose Co. v. Wood Flong Corp., 431 F.2d 505 (2d Cir. 1970).

If, however, we were in doubt on this score, that doubt would be resolved on another basis, namely, the article which appeared in *Concrete* magazine. That article, published in April 1959, 14 months before the earliest application date of the patents in suit, included a summary of a speech made by Klingel to concrete block autoclavers in Toledo, Ohio, in February 1959. The article read:

> "Boilerless Autoclave Plants" were described by John B. Klingel of Struthers Wells Corp., Titusville, Pa. as a feature of the Wednesday morning session. In this system the autoclave itself is a steam generator. The heating element is a fired heater containing vertical coils through which hot oil is pumped. Steam is generated by heat exchanger coils in the bottom of the autoclave. Condensate is returned to the autoclave or to a storage tank.

It is clear that the article disclosed the essentials of the Klingel patent claims: (1) By using the vessel or autoclave itself for generating steam, the use of a boiler is rendered unnecessary; (2) the heating element is indirect, consisting of a fired heater with coils and a heating medium, such as oil; (3) heat exchanger coils evaporate water in the bottom of the autoclave into steam; and (4) condensate is returned to the autoclave or to a storage tank for reuse.

Although the article is in broad terms and by its allusion to a speech it does not thereby constitute a "printed publication" of the speech (which in this case was considerably more precise), *see* Ballantyne Instruments & Electronics, Inc. v. Wagner, 345 F.2d 671 (6th Cir. 1965), the article need not be read in the abstract. Under 35 U.S.C. § 102(b), which precludes entitlement in case of description of the invention "in a printed publication . . . more than one year prior to the date of the application," the decisional law dictates that the article must be read in the light of the prior art readily available to a person of ordinary skill, diligence and knowledge in the art. Perfect Circle Corp. v. Hastings Manufacturing Co., 162 F.Supp. 777 (D.Mich. 1958); *cf.* Bros Inc. v. Browning Manufacturing Co., 317 F.2d 413 (8th Cir.), cert. denied, 375 U.S. 825, 84 S.Ct. 67, 11 L.Ed.2d 58 (1963); *see also* In re Foster, 343 F.2d 980, 52 CCPA 1808 (1965), cert. denied, 383 U.S. 966, 86 S. Ct. 1270, 16 L.Ed.2d 307 (1966). It is sufficient that the description in the printed publication impart to the person of ordinary skill sufficient information which, coupled with the disclosures of the prior art, would enable him to devise the invention without further genuine inspiration or undue experimentation. *See* In re Palmquist, 319 F.2d 547, 51 CCPA 839 (1963), overruled on other grounds, In re Foster, 343 F.2d 980, 989, 52 CCPA 1808 (1965). That is to say, the invention must be "described" under the statute not to the uninitiated layman but to the cognizant artisan.

Read in the light of the statute thus construed, the *Concrete* article basics added to the Gschwind teachings and claims would produce the Klingel device in the hands of an ordinary skillful autoclaver. Live steam except as may be returned from the article's condensate storage tank is omitted by it as an essential—even if Gschwind is read, as plaintiff-appellee would have us read him, to call for live steam as an essential component. The term "boilerless" in the article itself carries the necessary implication that live steam is not used by Klingel. Similarly, even if Gschwind is read not to include hot oil as a heating fluid or medium, as plaintiff-appellee would have us read him, the *Concrete* article supplies this missing link. Of course it can be argued that Gschwind and the article, taken together, do not call for steam originating from the bottom of the vessel by which superheating is avoided through steady evacuation upward of the air within. As we have previously pointed out, however, no claim for the point(s) of origin of steam was made in the patents in suit; if one had been, the trial below might have been on a different theory.

Thus, an additional, not an alternate, ground of our judgment that the patents here are invalid is that as a matter of law the invention was "described" in the *Concrete* publication within the meaning of § 102(b).

Accordingly, we reverse, and it is unnecessary for us to consider the several other grounds urged for reversal by the prevailing party here.