confidentiality or non-disclosure for the information sought; and

(c) whether the information sought was ever disclosed to any third party and, if so, when and to whom.

CONTINENTAL CABLEVISION, INC. By its attorneys,

Edward R. Lev
Ira K. Gross
 SULLIVAN & WORCESTER
 One Post Office Square
 Boston, Massachusetts 02109
 617/337-2800

May 31, 1983

**MAX DAETWYLER CORP. and MDC Max Daetwyler, A.G.**

v.

**INPUT GRAPHICS, INC., Benton Graphics, Inc., Joseph Halbherr and Rufus Benton.**

**Civ. A. No. 81–1140..**

United States District Court, E.D. Pennsylvania.

March 30, 1984.

See also, D.C., 541 F.Supp. 115.

Manny D. Pokotilow, George S. Seltzer, Caesar, Rivise, Bernstein & Cohen, Ltd., Philadelphia, Pa., for plaintiffs.

Robert C. Podwil, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., Peter T. Cobrin, Stempler & Cobrin, New York City, for defendants Benton Graphics and Rufus Benton.

Karl Spivak, Eric Marzluf, Steele, Gould & Fried, Philadelphia, Pa., for defendants Input Graphics, Inc. and Joseph Halbherr.

## OPINION

LOUIS H. POLLAK, District Judge.

In this action, plaintiffs seek injunctive relief and damages for alleged patent infringement and violations of § 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a). In July of 1982, I denied defendants' motions for summary judgment as to both the patent infringement and the Lanham Act claims of the amended complaint. *Max Daetwyler Corp. v. Input Graphics*, 545 F.Supp. 165. Following the submission of a second amended complaint by plaintiffs in December, 1982, which essentially realleged the two causes of action presented in the amended complaint, defendants filed two additional motions for summary judgment directed solely at the patent infringement claims. Those motions, which are the primary focus of the present Opinion, have been the subject of a series of briefs and two oral arguments before this court.

The essential facts surrounding this action and a description of the "doctor blade" which is the subject of this suit are fully reviewed in my 1982 opinion. Thus, only a relatively brief summary of the facts relevant to these motions will be presented in this Opinion.

Plaintiffs allege that defendants are infringing plaintiffs' patent for the Daetwyler doctor blade. A doctor blade is a blade-shaped device for wiping excess ink from the printing surface used in photogravure printing techniques. The doctor blade is a long thin strip of metal mounted so that the wiping edge will run very close to the surface of the printing cylinder. In the course of use, a doctor blade wears along the wiping surface. As the tip of a conven-

tional doctor blade wears away, the thickness of the blade tip in contact with the printing cylinder gradually increases. At some point in the use of such a doctor blade the tip becomes so thick that streaking and unsatisfactory print quality result. At that point, the printer must stop the press and replace the doctor blade at a significant cost in lost printing time and, thus, lost productivity.

The Daetwyler doctor blade is designed to retain a useful contact surface over a longer period of use. This is achieved by creating a blade which has a forward section of a constant, reduced thickness. The drawing from the patent presented below shows the difference between the patented blade and a conventional doctor blade. The conventional blade (represented in the drawing by the broken lines) is much thicker than the patented blade (represented in the drawing by the solid lines). When a conventional blade is worn-in to the point where its thickness exceeds the thickness shown at (7) in the drawing, it soon produces unacceptable print quality. The Daetwyler blade, being of a constant, reduced thickness, retains a relatively even area of contact with the printing cylinder and does not exceed a useable thickness until it wears down to the hilt of the blade. Thus, while only the tip, or beveled portion, of the conventional doctor blade can be used for printing, the entire forward section of the Daetwyler blade is useable. As a result, the Daetwyler blade does not have to be replaced as often as a conventional doctor blade.

One of the motions for summary judgment currently before me argues that the patent infringement claims alleged by plaintiffs should not be presented to a jury because, as a matter of law, the Benton doctor blade (distributed by defendant Input Graphics) does not infringe the patent. The other motion for summary judgment argues that the patent infringement claims fail due to invalidity of the patent. For the reasons which follow, I will deny both motions.

■ As noted in my earlier opinion in this action, in order to grant summary judgment in a patent infringement case, the court must be satisfied that (a) no genuine issue of material fact remains; (b) the technical nature of the patented invention can be fully appreciated without the aid of expert testimony; and (c) the accused device does not contain all the elements set forth in the claims which define the patented device. *See Scharmer v. Carrollton Mfg. Co.*, 525 F.2d 95, 103 (6th Cir.1975). Of course, as with any motion for summary judgment, a motion for summary judgment in a patent infringement case requires the court to view the evidence in the light most favorable to the

opposing party and to resolve all doubts and inferences in favor of the opponent of the motion. *Harold Friedman, Inc. v. Thorofare Markets, Inc.*, 587 F.2d 127, 131 (3d Cir.1978).

### 1. *Defendants' motion for summary judgment on the basis of non-infringement*

In this motion, defendants argue that the patent which plaintiffs seek to protect from infringement requires that the user of the blade engage in a process of "bevel matching." Defendants have submitted affidavits which state that "bevel matching" is not considered in the manufacture or sale of the Benton blade. Thus, defendants conclude, since one of the elements of the patent claims—"bevel matching"—is not part of the manufacture or sale of the allegedly infringing product, not every element of the patent claims can be found in the accused device and, therefore, the defendants cannot be found liable for patent infringement.

Defendants use the term "bevel matching" to describe a process by which the user of a doctor blade selects a particular Daetwyler doctor blade for use according to the thickness of the blade. The user must choose a blade of a thickness which will produce optimum tonal quality printing. More specifically, defendants argue that the patent states that the patented blade is chosen to be essentially identical in thickness to the thickness of a conventional doctor blade which has been worn or "run-in" to a point where the conventional blade would produce optimal print quality. Thus, in order to practice "bevel matching," a user would have to start by using a conventional blade. When that blade has been worn to the point where the printing quality it produces is "optimum," the conventional blade would be removed and its thickness measured along the wiping edge. Then a Daetwyler doctor blade of that thickness would be substituted.

Defendants' argument in support of their motion for summary judgment on the basis of noninfringement rests entirely upon their view that the patent claims should be interpreted to incorporate a requirement of "bevel matching." If the claims of the patent call for "bevel matching," then only a doctor blade which is selected by a process of "bevel matching" could infringe the patent. Since defendants have presented uncontradicted affidavits denying any use of "bevel matching" with their doctor blades, they could not be found liable for infringement of a patent which requires "bevel matching." However, if the patent does not require "bevel matching," then the statements in the affidavits presented by defendants are irrelevant to the question whether defendants have infringed plaintiffs' patent. Thus, the primary issue raised by this motion is whether the patent is properly interpreted to require "bevel matching."

■ It is generally said that patent infringement is a question of fact for the finder of fact. *Hadco Products, Inc. v. Frank Dini Co.*, 401 F.2d 462 (3d Cir.1968). However, when the basic facts are undisputed, the existence of infringement is treated as an issue of law for resolution by the court, often at summary judgment. *See Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929); 4 D.S. Chisum, *Patents* § 18.06[2] (1983).

■ Although the question whether a patent has been infringed is an issue of fact, the construction of a patent is a question of law. *See Coupe v. Royer*, 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (1895); *New Wrinkle, Inc. v. John L. Armitage & Co.*, 277 F.2d 409 (3d Cir.1960). The only exception to this rule is when extrinsic evidence is necessary to resolve a dispute about a term of art in the claim. *See Singer Manufacturing Co. v. Cramer*, 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437 (1904); *Super Products Corp. v. D P Way Corp.*, 546 F.2d 748, 192 U.S.P.Q. 417 (7th Cir.1976).

■ Many individual canons of interpretation have been developed by courts in their struggles to decipher patents. *See* D.S. Chisum, *Patents* § 18.03[2] (1983). Although the value of such maxims has

from time to time been questioned, there are certain principles which are widely accepted. *First,* the scope of an invention is measured by the claims of the patent. "Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them." *Autogiro Co. of America v. United States,* 384 F.2d 391, 188 Ct.Cl. 55 (1967). *Second,* the claims of a patent are to be interpreted with reference to the specifications and the drawings which make up the patent and in light of the prior art and file wrapper of the patent. "That is, a claim in a patent, like a clause in a contract, is to be construed in connection with the other terms of the instrument of which it forms a part and the whole instrument is to be interpreted with reference to the circumstances surrounding its inception." *Doble Engineering Co. v. Leeds & Northrup Co.,* 134 F.2d 78 (1st Cir.1943). *See Schmidinger v. Welsh,* 383 F.2d 455 (3d Cir.1967).

In the present case, the patent does not mention the process of "bevel matching" *in haec verba.* Nor does the patent discuss the process of "bevel matching" under any other name. The defendants' argument that "bevel matching" is part of the patent rests upon defendants' submission that the concept of "bevel matching" inheres by necessary implication from certain language in the patent.

Defendants focus upon particular phrases found in each of the independent claims of the patent.[1] One of those independent claims, claim 22, can be used as an example of this language. Claim 22 reads, in pertinent part, as follows:

[a] doctor blade for wiping excess ink from a printing surface of a printing form in lieu of a conventional doctor blade of a type having a constant blade thickness between two mutually parallel

blade surfaces and a generally wedge-shaped tip portion including a run-in *blade bevel having an optimum tonal quality size* ... comprising in combination:

a doctor blade having said blade thickness between said parallel blade surfaces, and a marginal blade tip portion adjacent said doctor blade body *having a shaped blade bevel essentially identical to said run-in blade bevel with said optimum tonal quality size* ... whereby the effective area of said shaped blade bevel *remains constantly at said optimum size* despite progressive wear of said marginal blade tip portion.

(emphasis added). Defendants claim that this language indicates that a blade which fits within this patent must be selected to have a particular thickness. That thickness will be essentially identical to that of a conventional doctor blade which has been run-in to a point at which the thickness of the surface which is in contact with the printing cylinder is such that optimum tonal quality printing is produced.

As further support for their argument, defendants point to the dependent claims of the patent which, they contend, should not be read to be any broader than the underlying independent claims. In particular, defendants note that certain dependent claims state that "said constant blade tip thickness has a value *selected* in the range of from 40 to 70 microns."[2] (emphasis added). This language, defendants urge, shows that a blade thickness which will produce optimum tonal quality printing is selected from blades which are produced in a range of blade thicknesses from 40 to 70 microns.

The language quoted from both the dependent and the independent claims, defendants argue, shows that it is expected that the user of the patented blade will choose which thickness of the patented doc-

---

1. The independent claims of the Daetwyler doctor blade patent are claims 1, 10, 22, and 30. All of the other claims in the patent are dependent claims which incorporate and refer back to one of the independent claims.

2. This language or similar language is found in claims 4, 13, 24, and 32 of the patent.

tor blade to use by reference to the thickness of a conventional doctor blade which is producing optimum tonal quality printing on that user's printing press. Particular emphasis is placed upon the fact that the patent uses the singular, rather than the plural, form of such words as "optimum tonal quality size" or "blade thickness." By using the singular form of these terms, defendants argue, the patent clearly requires that the blade used be of a single, unique thickness. Then, according to defendants' interpretation, the patent teaches that the particular blade thickness which must be used is determined by reference to the thickness which produces optimum tonal quality printing for the user. Thus, defendants conclude, since "optimum" denotes a single point along the spectrum of print quality and since the patent calls for the selection of a blade of a particular thickness which will produce such print quality, the process of "bevel matching" must be employed to comply with the patent.

■ Plaintiffs have submitted affidavits that "bevel matching" is not practiced in the use of the Daetwyler doctor blade. However, defendants note that whether plaintiffs or their customers employ "bevel matching" or whether "bevel matching" is a reasonable commercial practice is irrelevant to the question of what the patent means. Defendants insist that the claims of the patent determine the scope of the patent and that neither a patentee nor a court may expand the scope of a patent even if the patent, as written, does not correspond to commercial reality. Thus, defendants contend, the fact that plaintiffs do not consider "bevel matching" in the manufacture or sale of their doctor blade

should not affect the interpretation of the patent.[3]

Plaintiffs note that a patentee is afforded "lexicographic license" in defining terms in his patent. Thus, a patentee's definition of terms may displace dictionary meanings. See 4 A.W. Deller, *Deller's Walker on Patents* § 228 (2d ed. 1965 & Supp.1983). Plaintiffs have submitted excerpts from the deposition of the inventor of their doctor blade, Max Widmer. That deposition was taken during the pendency of this litigation. During the deposition, Widmer states that, as he understands his patent, he does not "select the bevel size of his patented doctor blade so it matches the size of the bevel of the conventional doctor blade which produces the best quality printing."

However, defendants point to another portion of the same deposition in which Widmer agrees that "optimum tonal quality size means[s] a size of a bevel such that you get the best possible printing one can obtain." Thus, defendants argue, even the inventor and original patentee of the Daetwyler doctor blade thinks that the term "optimum tonal quality size" used in the patent refers to a single size which is chosen to produce the best quality printing.

Thus, both the plaintiffs and the defendants in this litigation suggest that the concept of "lexicographic license" should be applied in support of their arguments. The testimony cited by defendants arguably supports their contention that the use of the singular rather than the plural form of such words as "optimum tonal quality size" indicates that the terms of the patent describe the selection of a blade thickness of a single optimum size. However, the testimony cited by defendants only shows that the print quality produced by the patented

---

3. Extrinsic evidence may be considered when interpreting terms of art in a patent. *Super Products Corp. v. D P Way Corp.*, 546 F.2d 748, 192 U.S.P.Q. 417 (7th Cir.1976). However, there is no suggestion from plaintiffs that this evidence about the non-use of "bevel matching" in commercial practice is intended to explain a "term of art" in the patent.

Furthermore, although summary judgment is not appropriate in a patent case when the tech-

nical nature of the device requires expert testimony, there is no contention that this evidence is submitted to show that further expert testimony is necessary in order to understand the patented invention. The invention in question in this action and the concept of "bevel matching" are not so complex that expert testimony is required in order to understand them.

blade is the best or "optimum." It does not state that there is a single blade size which can produce such optimum print quality but merely says that the "optimum tonal quality size" is *a* size which produces "optimum" print quality. Under this testimony, it is possible to fall within the inventor's view of the terms of the patent by using any thickness blade which still produces "optimum" print quality.

■ On the other hand, the portion of the Widmer testimony which plaintiffs cite more clearly supports the position for which it is quoted. Widmer's view of the meaning of particular terms of his patent deserves great weight when a court is faced with the task of interpreting a patent. Thus, Widmer's view that the patent does not call for "bevel matching" should be considered if a court is faced with the job of interpreting ambiguous terms of a patent or terms which one party suggests have a meaning far removed from the normal or dictionary meaning of such terms. However, when the inventor's statements as to the meaning of certain terms in his patent are made well after the time of the issuance of the patent, it may be inappropriate to place great weight on such statements in construing the patent. *Bossert Electric Construction Co. v. Pratt Chuck Co.*, 179 F. 385 (2d Cir.1910).

In the present case, it is unnecessary to rely upon a single statement of the inventor long after the patent was issued in order to construe the patent. It is apparent when considering the patent claims as a whole and when those claims are construed with reference to the specifications, that the patent is not limited to a blade which is chosen by "bevel matching." The concept of "bevel matching" is certainly not explicitly presented in the claims of the patent. The claims never suggest that the "optimum tonal quality size" which is referred to throughout is a single blade size for each user or printing job. In fact, although the defendants place great weight upon the statement in the claims that a

blade of "*an* optimum tonal quality size" is used, that term does not necessarily support defendants' conclusion that "bevel matching" is required by the patent. "*An* optimum tonal quality size" may be any size within a range of sizes which produces printing of a certain high quality. Thus, although the patent calls for the use of a Daetwyler doctor blade of "an optimum tonal quality size," this may be one of a range of thicknesses, not a unique thickness. The patent does not state that the blade used must be of "*the* optimum tonal quality size." Such a choice of language would more clearly support defendants' interpretation of the patent since it would suggest that "optimum tonal quality size" is a particular thickness.

The use of the term "optimum" throughout the relevant portions of the patent does not provide any further support for defendants' arguments. The term "optimum" is used in the patent only to refer to the quality of the printing produced by the patented blade. Although "optimum" refers to a single point at which print quality is best, it does not necessarily refer to a single blade size. Thus, the use of the word "optimum" in the patent is not inconsistent with a construction of the patent which allows the patented blade to be of any thickness which produces "optimum tonal quality" printing.[4]

The dependent claims of the patent further support this construction. Defendants argue that these claims cannot be interpreted to be any broader than the independent claims to which they refer. Even if defendants are correct as to the appropriate rule of construction, the claims do not support defendants' conclusion. The dependent claims state that the patented blade has a thickness in the range of 40 to 70 microns. This range of thicknesses referred to in the dependent claims does not expand the meaning of the term "optimum tonal quality size" as used in the independent claims. The dependent claims merely explain that although the blade thickness

---

**4.** Of course, the dependent claims of the patent limit the possible thicknesses of the patented blade to those within the range of 40 to 70 microns.

described in the independent claims is of "an optimum tonal quality size," that size does not include thicknesses of less than 40 microns or more than 70 microns even though thicknesses outside the 40 to 70 micron range may produce optimum tonal quality printing. Thus, the dependent claims lend support to a construction of the patent which does not require "bevel matching."

The specifications of a patent cannot expand the coverage of the claims; however, the specifications can be referred to in determining the appropriate construction of a patent. In the present case, the specifications also suggest that the "optimum tonal quality size" blade which must be used under the patent is not necessarily a blade of a unique size chosen by "bevel matching." At lines 47 to 52 of column 6 of the patent, it states "[f]rom a comparison of FIGS. 1 and 4 it will be apparent that initially the tip 16 must be run-in to a degree at which the run-in tip 4a is of a width or area sufficient to obtain desired tonal characteristics. In other words, the run-in blade bevel has an optimum tonal quality size." This language supports the conclusion that "optimum tonal quality size" is not a term which describes a single

thickness. An "optimum tonal quality size" is one which produces *desired tonal characteristics*. Thus, the thickness of the doctor blade which is to be used under the patent is one which falls within a range of blade thicknesses, any of which would produce desired print quality.

 Accordingly, I conclude that the patent for the Daetwyler doctor blade cannot properly be construed to include a concept of "bevel matching." The interpretation which defendants suggest, although possible when certain phrases of the patent are excerpted, read separately, and presented within defendants' suggested framework, cannot be supported when the claims of the patent are properly read as part of a whole instrument. It is particularly inappropriate to place such a strained interpretation on a patent in light of the admonition of the Court of Appeals for the Third Circuit that "a patent should not be struck down or its claims unnecessarily limited where a reasonable construction of the specifications and claims will protect the invention." *Corning Glass Works v. Anchor Hocking Glass Corp.*, 374 F.2d 473, 478 (3rd 1967).[5] Therefore, defendant's motion for summary judgment on the basis of noninfringement will be denied.[6]

---

**5.** The treatise which was cited for this proposition in the *Corning Glass* opinion also sets forth a list of "rules of construction" for patents. 4 A.W. Deller, *Deller's Walker on Patents* § 264 (2d ed. 1965). Among these are at least two "rules" which are pertinent to the issue presented in this motion. First, "[c]onstruction should favor the patentee in case of doubt." Second, "[c]laims should be construed according to a rational and practical mode and lead to neither absurd nor unjust results." The conclusion that "bevel matching" is not part of the Daetwyler blade patent is consonant with these rules as well.

**6.** Defendants have also argued that "optimum tonal quality" cannot be given anything other than its "commonly accepted dictionary meaning" because plaintiffs failed to respond to an interrogatory which required plaintiffs to list and explain any terms which plaintiffs would contend to have a definition other than the dictionary definition. First, it is unclear that the term "optimum tonal quality" is being used to mean anything other than its dictionary meaning in the patent as interpreted. Defend-

ants argue that the dictionary definition of "optimum" shows that this term describes a single point in the printing process at which print quality is best. This is not inconsistent with the view that an optimum print quality can be achieved by any number of blade thicknesses. Since the determination of when print quality is "optimum" is inherently subjective and since there is no proof that such quality cannot be produced by any of a number of blade thicknesses, there is no basis for concluding that the requirement of "optimum" print quality necessitates the selection of a blade of a single "optimum" size.

Second, defendants rely upon Federal Rule of Civil Procedure 37(b)(2)(A) for their argument that the failure to answer the interrogatory discussed should preclude certain arguments by plaintiffs in response to this motion. That rule allows a court to impose sanctions for failure to respond to discovery. One such sanction is a court order that the matters to which there has been no response be taken as admitted for the purposes of the litigation. However, that rule also states that a court should impose only such sanctions as are "just." I conclude that a sanc-

### 2. *Defendants' motion for summary judgment on the basis of invalidity*

■ The second motion for summary judgment argues that the patent which defendants allegedly infringed is invalid. Of course, an invalid patent cannot be infringed. 7 A.W. Deller, *Deller's Walker on Patents* § 588 (2d ed. 1972 & Supp.1983). Thus, if defendants can show that plaintiffs' patent is invalid, the infringement claims in the second amended complaint must fail.

Defendants' invalidity argument is based upon 35 U.S.C. § 102(b). That provision reads as follows:

A person shall be entitled to a patent unless—

. . . .

(b) the invention was patented or described in a printed publication in this or a foreign country .... more than one year prior to the date of the application for patent in the United States.

Such a prior publication or patent is said to "anticipate" the patent.

■ It is clear that defendants face a substantial burden when seeking to show that a patent is invalid. The Court of Appeals for the Third Circuit, in *Trio Process Corporation v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (1972) stated:

Congress provided in 35 U.S.C. § 282 (1970), that: "A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it." And this Court has recognized that " * * * the burden of proving invalidity

in the face of the presumption is a heavy one."

461 F.2d at 70.

■ Defendants argue that the invention described in the Daetwyler doctor blade patent was disclosed in West German Gebrauchmuster No. 1,976,227 which was issued to Wilhelm Ott more than one year prior to the issuance of the Daetwyler patent in the United States. A Gebrauchmuster (GM) is a limited type of West German patent. Such a patent only "anticipates" a United States patent to the extent of the claims of the GM. Thus, if the claims of the GM do not disclose the invention of the American patent but the drawings or specifications of the GM do disclose the invention, the American patent is not anticipated by the GM. The specifications and drawings in the GM can only be considered under § 102(b) to the extent that they help to explain the claims of the GM. *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809, 164 U.S.P.Q. 485 (7th Cir.1970).

Defendants also point to a portion of a 1966 German publication entitled the Tiefdruck-Jahrbuch (Rotogravure Yearbook). This article describes the Ott blade which is the subject of the GM discussed above. A prior publication such as the Rotogravure Yearbook, unlike a prior patent such as the GM, is considered as a whole to determine whether it anticipates the United States patent in question.

The standards of determining whether a prior publication, foreign or domestic, anticipates a United States patent are fairly well-established. Judge Weber reviewed these standards in *Chisolm-Ryder Co., Inc.*

---

tion which would preclude plaintiffs from presenting all of their arguments in response to a motion for summary judgment is not "just" under the circumstances.

To the extent that defendants have argued that the file wrapper of the patent suggests that bevel matching was incorporated in the patent in response to earlier rejections of the patent, I find no basis for such a conclusion in the materials in the record.

Defendants have also argued that plaintiffs may not use the doctrine of "equivalents" to sue defendants even though defendants do not prac-

tice "bevel matching." Defendants contend that if the patent is interpreted to require "bevel matching," that limitation in the patent cannot be ignored under the doctrine of "equivalents" because the history of the patent as shown in the "file wrapper" shows that the language which allegedly incorporates "bevel matching" into the patent was added in response to earlier rejections of the patent by the Patent Office. However, because I conclude that the patent cannot be interpreted to require "bevel matching," it is unnecessary to address these arguments.

**456**

*v. Lewis Mfg. Co.*, 187 U.S.P.Q. 93 (W.D.Pa. 1975):

The defense of prior publication has been offered here. The plaintiffs contend that the rule of *Seymour v. Osborne*, 78 U.S. [11 (Wall.) ] 516 [20 L.Ed. 33] (1870) should be applied, requiring that "the descriptions and drawings contain and exhibit a substantial representation of the patented improvement, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it pertains, to make, construct, and practice the invention to the same practical extent as they would be enabled to do if the information was derived from a prior patent." (p. 555 [20 L.Ed. 33] ). While the rule of *Seymour v. Osborne* was developed in the case of a foreign publication, we find that the same stringency is applied to American publications.

"For a prior publication to be sufficient to defeat a patent it must exhibit a substantial representation of the invention in such full, clear, and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent or on his own inventive skills." *Phillips Elec. & P. Indus. Corp. v. Thermal Indus.*, 450 F.2d 1164, 1169, 171 U.S.P.Q. 641, 644–5 (3d Cir.1971).

And

"It is sufficient that the description in the printed publication impart to the person of ordinary skill sufficient information which, coupled with the disclosures of the prior art, would enable him to devise the invention without further genuine inspiration or undue experimentation." *Struthers Scientific & Int. Corp. v. Rappl & Hoenig Co.*, 453 F.2d 250, 255, 172 U.S.P.Q. 257, 261 (2d Cir.1972).

A prior printed publication cannot be read in light of knowledge gained from a reading of the patent in suit in order to anticipate or render obvious to one skilled in the art the subject matter of the claim of a patent. *Rich Products Corp. v. Mitchell Foods, Inc.*, 357 F.2d 176, 180, 148 U.S.P.Q. 522, 524–5 (2d Cir.1966). And the subject matter of a patent claim is not anticipated or rendered obvious by the disclosure of a prior publication if such person must experiment in order to build a machine in accordance with such disclosure. *Allied Research Products Co., Inc. v. Heatbath Corp.*, 300 F.Supp. 656, 161 U.S.P.Q. 527 (N.D.Ill.1969).

187 U.S.P.Q. at 98–99.

Although the question of patent validity is ultimately an issue of law, it rests upon certain basic factual inquiries. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966). To the extent that these factual questions remain unanswered, it is not the province of the court to resolve those questions on a motion for summary judgment. In general, the question of substantial identity of the invention in the patent in question and the invention disclosed in the prior publication or patent must be left to the jury to determine. 1 A.W. Deller, *Deller's Walker on Patents* § 80 (2d ed. 1964 & Supp.1983).

It is clear in the present case that there are genuine issues of material fact which preclude a determination by me of the question of anticipation. Neither the claims of the GM nor the drawing and description in the Yearbook are so clearly identical to the Daetwyler doctor blade patent that a finding of anticipation is mandated as a matter of law on the current state of the record. Plaintiffs have responded to defendants' suggestions of anticipation with both arguments and evidence which show that resolution of the question whether the prior publication and patent are substantially identical to the Daetwyler patent depends on the answers to certain genuine factual disputes. Therefore, this is an issue which should be left to the finder of fact for determination following a full presentation of evidence—perhaps including expert testimony—and arguments from counsel. Accordingly, defendants' motion

for summary judgment on the basis of invalidity will be denied.[7]

### 3. *Motion for reconsideration of rulings on certain motions in limine*

On June 21, 1983, I denied three motions *in limine* filed by plaintiffs: Those motions had requested that (1) defendants be precluded from mentioning at trial the word "fraud," (2) all evidence or reference to plaintiffs' foreign patents, patent applications, or proceedings thereon be excluded at trial, and (3) all evidence or reference to the Ott Gebrauchmuster be excluded at trial. Plaintiffs have since moved for reconsideration of my rulings as to the latter two motions *in limine.*

 Both the original motions and the motions for reconsideration argue that the evidence in question is either irrelevant to the questions which will be presented at trial or, if relevant, will be substantially more prejudicial than probative. First, plaintiffs argue that evidence of the foreign patents, patent applications or proceedings is irrelevant to the question of patentability in the United States. This argument is based upon the fact that United States patent law differs significantly from the patent laws of foreign countries. Foreign determinations as to the patentability of an invention are clearly not controlling in an American court and hence, plaintiffs contend, cannot assist an American court in its application of United States patent law to the facts of an individual case. *E.g., Application of Dulberg,* 472 F.2d 1394 (C.C.P.A.1973); *Ditto Inc. v. Minnesota Mining and Manufacturing Co.,* 336 F.2d 67 (8th Cir.1964). However, portions of the foreign patent proceedings, foreign patent applications, or the foreign patents themselves may be relevant evidence on the factual issues raised in a United States patent action. At this juncture, I cannot find that plaintiffs' foreign patents, patent applications, and patent

proceedings do not involve information which would be relevant to the issues presented in this suit.

 Plaintiffs' arguments that evidence of the foreign patents or proceedings may be unduly prejudicial stem from the fact that this action will be tried to a jury. Plaintiffs argue that the trial will be substantially increased in length and the jury will be greatly confused if plaintiffs are required to present evidence to explain or counter any evidence about foreign patents, proceedings, and determinations. However, the fact that plaintiffs have chosen to exercise their right to trial by jury does not mandate the exclusion of items of relevant evidence which defendants wish to present.

Under the circumstances, I conclude that any potential prejudice to plaintiffs from the limited use which defendants seek to make of plaintiffs' foreign patents, patent applications and proceedings can be alleviated by allowing plaintiffs to present evidence on such issues as the relevant differences between the foreign law and United States patent law. Furthermore, this determination is without prejudice to plaintiffs' right to request that appropriate curative and limiting instructions be given to the jury at the time that the potentially prejudicial evidence is presented and/or in the charge to the jury at the close of trial.

Second, plaintiffs argue that the West German GM discussed in the analysis of the motion for summary judgment based upon invalidity of the patent should be excluded from evidence at the trial. Again, plaintiffs' argument for exclusion is based upon the view that such evidence is irrelevant or substantially more prejudicial than probative.

As shown in the discussion of the motion for summary judgment based upon invalidity, defendants seek to introduce evidence on the GM to show that the Daetwyler doctor blade patent was "anticipated" by a

---

7. This determination that factual issues remain for resolution on the question of patent invalidity is made without prejudice to defendants' right to assert that, as a matter of law, certain factual

distinctions between the invention disclosed in the GM or Yearbook and the Daetwyler patent are irrelevant to the question of anticipation and that the fact-finder should be so instructed.

**458**

foreign patent and/or publication. In light of my determination that the question of "anticipation" was properly one for the jury, it would be inappropriate for the GM to be excluded from evidence at trial. The GM is clearly relevant to one of the defenses to the patent infringement claims brought by the plaintiffs. Any potential prejudice to plaintiffs—a "prejudice" I deem quote remote—is outweighed by the importance of this evidence to this defense.

 Plaintiffs argue in the alternative that if the GM is not to be excluded at trial, the specifications and drawings in the GM should be excluded and only the claims themselves admitted. This argument is based upon the fact that, as a matter of law, only the claims of a GM determine whether the GM anticipates the patent in question. The claims of the GM must be compared to the claims of the patent in order to determine whether the GM is "substantially identical" to the United States patent. Although the proper comparison is solely between the claims of the GM and the patent, the specifications and drawings of the GM may be relevant for the purpose of clarifying the meaning of the language used in the claims of the GM. *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809, 164 U.S.P.Q. 485 (7th Cir.1970). Thus, evidence of the GM, its specifications, and its drawings is relevant to this action and is not substantially more prejudicial than probative. Any prejudice to plaintiffs can be eliminated by the means discussed above with reference to the evidence on foreign patents and patent proceedings involving the Daetwyler blade.

Accordingly, plaintiffs' motion for reconsideration of this court's order dated June 21, 1983 will be denied. All of the rulings made in this Opinion will be reflected in an accompanying Order.

### ORDER

For the reasons stated in the accompanying Opinion, it is hereby ORDERED that:

1. Defendants' motion for summary judgment on the basis of noninfringement is DENIED.

2. Defendants' motion for summary judgment on the basis of invalidity is DENIED.

3. Plaintiffs' motion for reconsideration of this court's Order dated June 21, 1983 regarding certain motions *in limine* is DENIED.